(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LORENZO *v.* SECURITIES AND EXCHANGE COMMISSION

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–1077. Argued December 3, 2018—Decided March 27, 2019

Securities and Exchange Commission Rule 10b–5 makes it unlawful to (a) "employ any device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact," or (c) "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit" in connection with the purchase or sale of securities. In *Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U. S. 135, this Court held that to be a "*maker*" of a statement under subsection (b) of that Rule, one must have "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*, at 142 (emphasis added). On the facts of *Janus*, this meant that an investment adviser who had merely "participat[ed] in the drafting of a false statement" "made" by another could not be held liable in a private action under subsection (b). *Id.*, at 145.

Petitioner Francis Lorenzo, while the director of investment banking at an SEC-registered brokerage firm, sent two e-mails to prospective investors. The content of those e-mails, which Lorenzo's boss supplied, described a potential investment in a company with "confirmed assets" of $10 million. In fact, Lorenzo knew that the company had recently disclosed that its total assets were worth less than $400,000.

In 2015, the Commission found that Lorenzo had violated Rule 10b–5, §10(b) of the Exchange Act, and §17(a)(1) of the Securities Act by sending false and misleading statements to investors with intent to defraud. On appeal, the District of Columbia Circuit held that Lorenzo could not be held liable as a "maker" under subsection (b) of the Rule in light of *Janus*, but sustained the Commission's finding with respect to subsections (a) and (c) of the Rule, as well as §10(b) and

§17(a)(1).

*Held*: Dissemination of false or misleading statements with intent to
  defraud can fall within the scope of Rules 10b–5(a) and (c), as well as
  the relevant statutory provisions, even if the disseminator did not
  "make" the statements and consequently falls outside Rule 10b–5(b).
  Pp. 5–13.

  (a) It would seem obvious that the words in these provisions are,
as ordinarily used, sufficiently broad to include within their scope the
dissemination of false or misleading information with the intent to
defraud. By sending e-mails he understood to contain material un-
truths, Lorenzo "employ[ed]" a "device," "scheme," and "artifice to de-
fraud" within the meaning of subsection (a) of the Rule, §10(b), and
§17(a)(1). By the same conduct, he "engage[d] in a[n] act, practice, or
course of business" that "operate[d] . . . as a fraud or deceit" under
subsection (c) of the Rule. As Lorenzo does not challenge the appeals
court's scienter finding, it is undisputed that he sent the e-mails with
"intent to deceive, manipulate, or defraud" the recipients. *Aaron* v.
*SEC*, 446 U. S. 680, 686, and n. 5. Resort to the expansive dictionary
definitions of "device," "scheme," and "artifice" in Rule 10b–5(a) and
§17(a)(1), and of "act" and "practice" in Rule 10b–5(c), only strength-
ens this conclusion. Under the circumstances, it is difficult to see
how Lorenzo's actions could escape the reach of these provisions.
Pp. 5–7.

  (b) Lorenzo counters that the only way to be liable for false state-
ments is through those provisions of the securities laws—like Rule
10b–5(b)—that refer *specifically* to false statements. Holding to the
contrary, he and the dissent say, would render subsection (b) "super-
fluous." The premise of this argument is that each subsection gov-
erns different, mutually exclusive, spheres of conduct. But this Court
and the Commission have long recognized considerable overlap
among the subsections of the Rule and related provisions of the secu-
rities laws. And the idea that each subsection governs a separate
type of conduct is difficult to reconcile with the Rule's language, since
at least some conduct that amounts to "employ[ing]" a "device,
scheme, or artifice to defraud" under subsection (a) also amounts to
"engag[ing] in a[n] act . . . which operates . . . as a fraud" under sub-
section (c). This Court's conviction is strengthened by the fact that
the plainly fraudulent behavior confronted here might otherwise fall
outside the Rule's scope. Using false representations to induce the
purchase of securities would seem a paradigmatic example of securi-
ties fraud. Pp. 7–9.

  (c) Lorenzo and the dissent make a few other important arguments.
The dissent contends that applying Rules 10b–5(a) and (c) to conduct
like Lorenzo's would render *Janus* "a dead letter." *Post*, at 9. But

*Janus* concerned subsection (b), and it said nothing about the Rule's application to the dissemination of false or misleading information. Thus, *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information—provided, of course, that the individual is not involved in some other form of fraud. Lorenzo also claims that imposing primary liability upon his conduct would erase or at least weaken the distinction between primary and secondary liability under the statute's "aiding and abetting" provision. See 15 U. S. C. §78t(e). But the line the Court adopts today is clear: Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), §10(b), and §17(a)(1), even if they are secondarily liable under Rule 10b–5(b). As for Lorenzo's suggestion that those like him ought to be held secondarily liable, this offer will, too often, prove illusory. Where a "maker" of a false statement does not violate subsection (b) of the Rule (perhaps because he lacked the necessary intent), a disseminator of those statements, even one knowingly engaged in an egregious fraud, could not be held to have violated the "aiding and abetting" statute. And if, as Lorenzo claims, the disseminator has not primarily violated other parts of Rule 10b–5, then such a fraud, whatever its intent or consequences, might escape liability altogether. That anomalous result is not what Congress intended. Pp. 9–13.

872 F. 3d 578, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined. KAVANAUGH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1077

_____

## FRANCIS V. LORENZO, PETITIONER *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 27, 2019]

JUSTICE BREYER delivered the opinion of the Court.

Securities and Exchange Commission Rule 10b–5 makes it unlawful:

> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact . . . , or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . .
>
> in connection with the purchase or sale of any security." 17 CFR §240.10b–5 (2018).

In *Janus Capital Group, Inc.* v. *First Derivative Traders,* 564 U. S. 135 (2011), we examined the second of these provisions, Rule 10b–5(b), which forbids the "mak[ing]" of "any untrue statement of a material fact." We held that the "*maker* of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*, at 142 (emphasis added). We said that "[w]ithout control, a person or entity can merely suggest what to say, not

'make' a statement in its own right." *Ibid.* And we illustrated our holding with an analogy: "[W]hen a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.,* at 143. On the facts of *Janus*, this meant that an investment adviser who had merely "participat[ed] in the drafting of a false statement" "made" by another could not be held liable in a private action under subsection (b) of Rule 10b–5. *Id.,* at 145.

In this case, we consider whether those who do not "make" statements (as *Janus* defined "make"), but who disseminate false or misleading statements to potential investors with the intent to defraud, can be found to have violated the *other* parts of Rule 10b–5, subsections (a) and (c), as well as related provisions of the securities laws, §10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. §78j(b), and §17(a)(1) of the Securities Act of 1933, 48 Stat. 84–85, as amended, 15 U. S. C. §77q(a)(1). We believe that they can.

I

A

For our purposes, the relevant facts are not in dispute. Francis Lorenzo, the petitioner, was the director of investment banking at Charles Vista, LLC, a registered broker-dealer in Staten Island, New York. Lorenzo's only investment banking client at the time was Waste2Energy Holdings, Inc., a company developing technology to convert "solid waste" into "clean renewable energy."

In a June 2009 public filing, Waste2Energy stated that its total assets were worth about $14 million. This figure included intangible assets, namely, intellectual property, valued at more than $10 million. Lorenzo was skeptical of this valuation, later testifying that the intangibles were a "dead asset" because the technology "didn't really work."

During the summer and early fall of 2009, Waste2Energy hired Lorenzo's firm, Charles Vista, to sell to investors $15 million worth of debentures, a form of "debt secured only by the debtor's earning power, not by a lien on any specific asset," Black's Law Dictionary 486 (10th ed. 2014).

In early October 2009, Waste2Energy publicly disclosed, and Lorenzo was told, that its intellectual property was worthless, that it had "'"[w]rit[ten] off . . . all [of its] intangible assets,"'" and that its total assets (as of March 31, 2009) amounted to $370,552.

Shortly thereafter, on October 14, 2009, Lorenzo sent two e-mails to prospective investors describing the debenture offering. According to later testimony by Lorenzo, he sent the e-mails at the direction of his boss, who supplied the content and "approved" the messages. The e-mails described the investment in Waste2Energy as having "3 layers of protection," including $10 million in "confirmed assets." The e-mails nowhere revealed the fact that Waste2Energy had publicly stated that its assets were in fact worth less than $400,000. Lorenzo signed the e-mails with his own name, he identified himself as "Vice President—Investment Banking," and he invited the recipients to "call with any questions."

B

In 2013, the Securities and Exchange Commission instituted proceedings against Lorenzo (along with his boss and Charles Vista). The Commission charged that Lorenzo had violated Rule 10b–5, §10(b) of the Exchange Act, and §17(a)(1) of the Securities Act. Ultimately, the Commission found that Lorenzo had run afoul of these provisions by sending false and misleading statements to investors with intent to defraud. As a sanction, it fined Lorenzo $15,000, ordered him to cease and desist from violating the securities laws, and barred him from working

in the securities industry for life.

Lorenzo appealed, arguing primarily that in sending the e-mails he lacked the intent required to establish a violation of Rule 10b–5, §10(b), and §17(a)(1), which we have characterized as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Aaron* v. *SEC*, 446 U. S. 680, 686, and n. 5 (1980). With one judge dissenting, the Court of Appeals panel rejected Lorenzo's lack-of-intent argument. 872 F. 3d 578, 583 (CADC 2017). Lorenzo does not challenge the panel's scienter finding. Reply Brief 17.

Lorenzo also argued that, in light of *Janus*, he could not be held liable under subsection (b) of Rule 10b–5. 872 F. 3d, at 586–587. The panel agreed. Because his boss "asked Lorenzo to send the emails, supplied the central content, and approved the messages for distribution," *id.*, at 588, it was the boss that had "ultimate authority" over the content of the statement "and whether and how to communicate it," *Janus*, 563 U. S., at 142. (We took this case on the assumption that Lorenzo was not a "maker" under subsection (b) of Rule 10b–5, and do not revisit the court's decision on this point.)

The Court of Appeals nonetheless sustained (with one judge dissenting) the Commission's finding that, by knowingly disseminating false information to prospective investors, Lorenzo had violated other parts of Rule 10b–5, subsections (a) and (c), as well as §10(b) and §17(a)(1).

Lorenzo then filed a petition for certiorari in this Court. We granted review to resolve disagreement about whether someone who is not a "maker" of a misstatement under *Janus* can nevertheless be found to have violated the other subsections of Rule 10b–5 and related provisions of the securities laws, when the only conduct involved concerns a misstatement. Compare *e.g.,* 872 F. 3d 578, with *WPP Luxembourg Gamma Three Sarl* v. *Spot Runner, Inc.*, 655 F. 3d 1039, 1057–1058 (CA9 2011).

## II

### A

At the outset, we review the relevant provisions of Rule 10b–5 and of the statutes. See Appendix, *infra.* As we have said, subsection (a) of the Rule makes it unlawful to "employ any device, scheme, or artifice to defraud." Subsection (b) makes it unlawful to "make any untrue statement of a material fact." And subsection (c) makes it unlawful to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." See 17 CFR §240.10b–5.

There are also two statutes at issue. Section 10(b) makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" in contravention of Commission rules and regulations. 15 U. S. C. §78j(b). By its authority under that section, the Commission promulgated Rule 10b–5. The second statutory provision is §17(a), which, like Rule 10b–5, is organized into three subsections. 15 U. S. C. §77q(a). Here, however, we consider only the first subsection, §17(a)(1), for this is the only subsection that the Commission charged Lorenzo with violating. Like Rule 10b–5(a), (a)(1) makes it unlawful to "employ any device, scheme, or artifice to defraud."

### B

After examining the relevant language, precedent, and purpose, we conclude that (assuming other here-irrelevant legal requirements are met) dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, as well as the relevant statutory provisions. In our view, that is so even if the disseminator did not "make" the statements and consequently falls outside subsection (b) of the Rule.

It would seem obvious that the words in these provisions are, as ordinarily used, sufficiently broad to include within

their scope the dissemination of false or misleading information with the intent to defraud. By sending emails he understood to contain material untruths, Lorenzo "employ[ed]" a "device," "scheme," and "artifice to defraud" within the meaning of subsection (a) of the Rule, §10(b), and §17(a)(1). By the same conduct, he "engage[d] in a[n] act, practice, or course of business" that "operate[d] . . . as a fraud or deceit" under subsection (c) of the Rule. Recall that Lorenzo does not challenge the appeals court's scienter finding, so we take for granted that he sent the emails with "intent to deceive, manipulate, or defraud" the recipients. *Aaron*, 446 U. S., at 686, n. 5. Under the circumstances, it is difficult to see how his actions could escape the reach of those provisions.

Resort to dictionary definitions only strengthens this conclusion. A "'device,'" we have observed, is simply "'[t]hat which is devised, or formed by design'"; a "'scheme'" is a "'project,'" "'plan[,] or program of something to be done'"; and an "'artifice'" is "'an artful stratagem or trick.'" *Id.*, at 696, n. 13 (quoting Webster's International Dictionary 713, 2234, 157 (2d ed. 1934) (Webster's Second)). By these lights, dissemination of false or misleading material is easily an "artful stratagem" or a "plan," "devised" to defraud an investor under subsection (a). See Rule 10b–5(a) (making it unlawful to "employ any device, scheme, or artifice to defraud"); §17(a)(1) (same). The words "act" and "practice" in subsection (c) are similarly expansive. Webster's Second 25 (defining "act" as "a doing" or a "thing done"); *id.,* at 1937 (defining "practice" as an "action" or "deed"); see Rule 10b–5(c) (making it unlawful to "engage in a[n] act, practice, or course of business" that "operates . . . as a fraud or deceit").

These provisions capture a wide range of conduct. Applying them may present difficult problems of scope in borderline cases. Purpose, precedent, and circumstance

could lead to narrowing their reach in other contexts. But we see nothing borderline about this case, where the relevant conduct (as found by the Commission) consists of disseminating false or misleading information to prospective investors with the intent to defraud. And while one can readily imagine other actors tangentially involved in dissemination—say, a mailroom clerk—for whom liability would typically be inappropriate, the petitioner in this case sent false statements directly to investors, invited them to follow up with questions, and did so in his capacity as vice president of an investment banking company.

C

Lorenzo argues that, despite the natural meaning of these provisions, they should not reach his conduct. This is so, he says, because the only way to be liable for false statements is through those provisions that refer *specifically* to false statements. Other provisions, he says, concern "scheme liability claims" and are violated only when conduct other than misstatements is involved. Brief for Petitioner 4–6, 28–30. Thus, only those who "make" untrue statements under subsection (b) can violate Rule 10b–5 in connection with statements. (Similarly, §17(a)(2) would be the sole route for finding liability for statements under §17(a).) Holding to the contrary, he and the dissent insist, would render subsection (b) of Rule 10b–5 "superfluous." See *post*, at 6–7 (opinion of THOMAS, J.).

The premise of this argument is that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct. But this Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws. See *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 383 (1983) ("[I]t is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct" (internal quotation

marks omitted)).    As we have explained, these laws
marked the "first experiment in federal regulation of the
securities industry."    *SEC* v. *Capital Gains Research
Bureau, Inc.*, 375 U. S. 180, 198 (1963).  It is "understand-
able, therefore," that "in declaring certain practices unlaw-
ful," it was thought prudent "to include both a general
proscription against fraudulent and deceptive practices
and, out of an abundance of caution, a specific proscription
against nondisclosure" even though "a specific proscription
against nondisclosure" might in other circumstances be
deemed "surplusage." *Id.,* at 198–199. "Each succeeding
prohibition" was thus "meant to cover additional kinds of
illegalities—not to narrow the reach of the prior sections."
*United States* v. *Naftalin*, 441 U. S. 768, 774 (1979).  We
have found "'no warrant for narrowing alternative provi-
sions . . . adopted with the purpose of affording added
safeguards.'"    *Ibid.* (quoting *United States* v. *Gilliland*,
312 U. S. 86, 93 (1941)); see *Affiliated Ute Citizens of Utah*
v. *United States*, 406 U. S. 128, 152–153 (1972) (While "the
second subparagraph of [Rule 10b–5] specifies the making
of an untrue statement . . .  [t]he first and third subpara-
graphs are not so restricted").  And since its earliest days,
the Commission has not viewed these provisions as mutu-
ally exclusive.  See, *e.g., In re R. D. Bayly & Co.*, 19 S. E. C.
773 (1945) (finding violations of what would become Rules
10b–5(b) and (c) based on the same misrepresentations
and omissions); *In re Arthur Hays & Co.*, 5 S. E. C. 271
(1939) (finding violations of both §§17(a)(2) and (a)(3)
based on false representations in stock sales).
    The idea that each subsection of Rule 10b–5 governs a
separate type of conduct is also difficult to reconcile with
the language of subsections (a) and (c).  It should go with-
out saying that at least some conduct amounts to "em-
ploy[ing]" a "device, scheme, or artifice to defraud" under
subsection (a) as well as "engag[ing] in a[n] act . . . which
operates . . . as a fraud" under subsection (c).  In *Affiliated*

*Ute*, for instance, we described the "defendants' activities" as falling "within the very language of one or the other of those subparagraphs, a 'course of business' or a 'device, scheme, or artifice' that operated as a fraud." 406 U. S., at 153. (The dissent, for its part, offers no account of how the superfluity problems that motivate its interpretation can be avoided where subsections (a) and (c) are concerned.)

Coupled with the Rule's expansive language, which readily embraces the conduct before us, this considerable overlap suggests we should not hesitate to hold that Lorenzo's conduct ran afoul of subsections (a) and (c), as well as the related statutory provisions. Our conviction is strengthened by the fact that we here confront behavior that, though plainly fraudulent, might otherwise fall outside the scope of the Rule. Lorenzo's view that subsection (b), the making-false-statements provision, *exclusively* regulates conduct involving false or misleading statements would mean those who disseminate false statements with the intent to cheat investors might escape liability under the Rule altogether. But using false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud. We do not know why Congress or the Commission would have wanted to disarm enforcement in this way. And we cannot easily reconcile Lorenzo's approach with the basic purpose behind these laws: "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Capital Gains*, 375 U. S., at 186. See also, *e.g., SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 299 (1946) (the securities laws were designed "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits").

## III

Lorenzo and the dissent make a few other important

arguments. They contend that applying subsections (a) or
(c) of Rule 10b–5 to conduct like his would render our
decision in *Janus* (which we described at the outset, *su-
pra,* at 1–2) "a dead letter*," post*, at 9. But we do not see
how that is so. In *Janus*, we considered the language in
subsection (b), which prohibits the "mak[ing]" of "any
untrue statement of a material fact." See 564 U. S., at
141–143. We held that the "maker" of a "statement" is the
"person or entity with ultimate authority over the state-
ment." *Id.*, at 142. And we found that subsection (b) did
not (under the circumstances) cover an investment adviser
who helped *draft* misstatements issued by a *different*
entity that controlled the statements' content. *Id.,* at 146–
148. We said nothing about the Rule's application to the
dissemination of false or misleading information. And we
can assume that *Janus* would remain relevant (and pre-
clude liability) where an individual neither *makes* nor
*disseminates* false information—provided, of course, that
the individual is not involved in some other form of fraud.

Next, Lorenzo points to the statute's "aiding and abet-
ting" provision. 15 U. S. C. §78t(e). This provision, en-
forceable only by the Commission (and not by private
parties), makes it unlawful to "knowingly or recklessly . . .
provid[e] substantial assistance to another person" who
violates the Rule. *Ibid.*; see *Janus*, 564 U. S., at 143 (cit-
ing *Central Bank of Denver, N. A.* v. *First Interstate Bank
of Denver, N. A.*, 511 U. S. 164 (1994)). Lorenzo claims
that imposing primary liability upon his conduct would
erase or at least weaken what is otherwise a clear distinc-
tion between primary and secondary (*i.e.*, aiding and
abetting) liability. He emphasizes that, under today's
holding, a disseminator might be a primary offender with
respect to subsection (a) of Rule 10b–5 (by employing a
"scheme" to "defraud") and also secondarily liable as an
aider and abettor with respect to subsection (b) (by provid-
ing substantial assistance to one who "makes" a false

statement). And he refers to two cases that, in his view, argue in favor of circumscribing primary liability. See *Central Bank*, 511 U. S., at 164; *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148 (2008).

We do not believe, however, that our decision creates a serious anomaly or otherwise weakens the distinction between primary and secondary liability. For one thing, it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another. John, for example, might sell Bill an unregistered firearm in order to help Bill rob a bank, under circumstances that make him primarily liable for the gun sale and secondarily liable for the bank robbery.

For another, the cases to which Lorenzo refers do not help his cause. Take *Central Bank*, where we held that Rule 10b–5's private right of action does not permit suits against secondary violators. 511 U. S., at 177. The holding of *Central Bank*, we have said, suggests the need for a "clean line" between conduct that constitutes a primary violation of Rule 10b–5 and conduct that amounts to a secondary violation. *Janus*, 564 U. S., at 143, and n. 6. Thus, in *Janus*, we sought an interpretation of "make" that could neatly divide primary violators and actors too far removed from the ultimate decision to communicate a statement. *Ibid.* (citing *Central Bank*, 511 U. S. 164). The line we adopt today is just as administrable: Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), §10(b), and §17(a)(1), even if they are secondarily liable under Rule 10b–5(b). Lorenzo suggests that classifying dissemination as a primary violation would inappropriately subject peripheral players in fraud (including him, naturally) to substantial liability. We suspect the investors who received Lorenzo's e-mails would not view the deception so

favorably.  And as *Central Bank* itself made clear, even a
bit participant in the securities markets "may be liable as
a primary violator under [Rule] 10b–5" so long as "all of
the requirements for primary liability . . . are met."  *Id.,*
at 191.

Lorenzo's reliance on *Stoneridge* is even further afield.
There, we held that private plaintiffs could not bring suit
against certain securities defendants based on *undisclosed*
deceptions upon which the plaintiffs could not have
relied.  552 U. S., at 159.  But the Commission, unlike
private parties, need not show reliance in its enforcement
actions.  And even supposing reliance were relevant here,
Lorenzo's conduct involved the direct transmission of false
statements to prospective investors intended to induce
reliance—far from the kind of concealed fraud at issue in
*Stoneridge*.

As for Lorenzo's suggestion that those like him ought to
be held secondarily liable, this offer will, far too often,
prove illusory.  In instances where a "maker" of a false
statement does *not* violate subsection (b) of the Rule (per-
haps because he lacked the necessary intent), a dissemina-
tor of those statements, even one knowingly engaged in an
egregious fraud, could not be held to have violated the
"aiding and abetting" statute.  That is because the statute
insists that there be a primary violator to whom the sec-
ondary violator provided "substantial assistance."    15
U. S. C. §78t(e).  And the latter can be "deemed to be in
violation" of the provision only "to the same extent as the
person to whom such assistance is provided."  *Ibid.*  In
other words, if Acme Corp. could not be held liable under
subsection (b) for a statement it made, then a knowing
disseminator of those statements could not be held liable
for aiding and abetting Acme under subsection (b).  And if,
as Lorenzo claims, the disseminator has not primarily
violated other parts of Rule 10b–5, then such a fraud,
whatever its intent or consequences, might escape liability

altogether.

That is not what Congress intended. Rather, Congress intended to root out all manner of fraud in the securities industry. And it gave to the Commission the tools to accomplish that job.

\*    \*    \*

For these reasons, the judgment of the Court of Appeals is affirmed.

*So ordered.*

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

APPENDIX

**17 CFR §240.10b–5**

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

in connection with the purchase or sale of any security."

**15 U. S. C. §78j**

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*　　\*　　\*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

Appendix to opinion of the Court

necessary or appropriate in the public interest or for the protection of investors."

## 15 U. S. C. §77q

"(a) Use of interstate commerce for purpose of fraud or deceit

"It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

## 15 U. S. C. §78t

"(e) Prosecution of persons who aid and abet violations

"For purposes of any action brought by the Commission . . . , any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed in violation of such provision to the same extent as the person to whom such assistance is provided.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1077

_____

FRANCIS V. LORENZO, PETITIONER *v.* SECURITIES
AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 27, 2019]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, dissenting.

In *Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U. S. 135 (2011), we drew a clear line between primary and secondary liability in fraudulent-misstatement cases: A person does not "make" a fraudulent misstatement within the meaning of Securities and Exchange Commission (SEC) Rule 10b–5(b)—and thus is not primarily liable for the statement—if the person lacks "ultimate authority over the statement." *Id.,* at 142. Such a person could, however, be liable as an aider and abettor under principles of secondary liability.

Today, the Court eviscerates this distinction by holding that a person who has not "made" a fraudulent misstatement can nevertheless be primarily liable for it. Because the majority misconstrues the securities laws and flouts our precedent in a way that is likely to have far-reaching consequences, I respectfully dissent.

I

To appreciate the sweeping nature of the Court's holding, it is helpful to begin with the facts of this case. On October 14, 2009, the owner of the firm at which petitioner Frank Lorenzo worked instructed him to send e-mails to two clients regarding a debenture offering. The owner

explained that he wanted the e-mails to come from the firm's investment-banking division, which Lorenzo directed. Lorenzo promptly addressed an e-mail to each client, "cut and pasted" the contents of each e-mail—which he received from the owner—into the body, and "sent [them] out." App. 321. It is undisputed that Lorenzo did not draft the e-mails' contents, though he knew that they contained false or misleading statements regarding the debenture offering. Both e-mails stated that they were sent "[a]t the request of" the owner of the firm. *Id.,* at 403, 405. No other allegedly fraudulent conduct is at issue.

In 2013, the SEC brought enforcement proceedings against the owner of the firm, the firm itself, and Lorenzo. Even though Lorenzo sent the e-mails at the owner's request, the SEC did not charge Lorenzo with aiding and abetting fraud committed by the owner. See 15 U. S. C. §§ 77o(b), 78o(b)(4)(E), 78t(e). Instead, the SEC charged Lorenzo as a primary violator of multiple securities laws,[1] including Rule 10b–5(b), which prohibits "mak[ing] any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 CFR §240.10b–5(b) (2018); see *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 212–214 (1976) (construing Rule 10b–5(b) to require scienter). The SEC ultimately concluded that, by "knowingly sen[ding] materially misleading language from his own email account to prospective investors," App. to Pet. for Cert. 77, Lorenzo violated Rule 10b–5(b) and several other antifraud provisions of the securities laws. The SEC "barred [him] from serving in the securities industry" for life. *Id.,* at 91.

The Court of Appeals unanimously rejected the SEC's determination that Lorenzo violated Rule 10b–5(b). Ap-

---

[1] For ease of reference, I use "securities laws" to refer to both statutes and SEC regulations.

plying *Janus*, the court held that Lorenzo did not "make" the false statements at issue because he merely "transmitted statements devised by [his boss] at [his boss'] direction." 872 F. 3d 578, 587 (CADC 2017). The SEC has not challenged that aspect of the decision below.

The panel majority nevertheless upheld the SEC's decision holding Lorenzo primarily liable for the same false statements under other provisions of the securities laws—specifically, §10(b) of the Securities Exchange Act of 1934 (1934 Act), Rules 10b–5(a) and (c), and §17(a)(1) of the Securities Act of 1933 (1933 Act). Unlike Rule 10b–5(b), none of these provisions pertains specifically to fraudulent misstatements.

## II

Even though Lorenzo undisputedly did not "make" the false statements at issue in this case under Rule 10b–5(b), the Court follows the SEC in holding him primarily liable for those statements under other provisions of the securities laws. As construed by the Court, each of these more general laws completely subsumes Rule 10b–5(b) and §17(a)(2) of the 1933 Act in cases involving fraudulent misstatements, even though these provisions specifically govern false statements. The majority's interpretation of these provisions cannot be reconciled with their text or our precedents. Thus, I am once again compelled to "disagre[e] with the SEC's broad view" of the securities laws. *Janus*, *supra*, at 145, n. 8.

## A

I begin with the text. The Court of Appeals held that Lorenzo violated §10(b) of the 1934 Act and Rules 10b–5(a) and (c). In relevant part, §10(b) makes it unlawful for a person, in connection with the purchase or sale of a security, "[t]o use or employ . . . any manipulative or deceptive device or contrivance" in contravention of an SEC rule. 15

U. S. C. §78j(b). Rule 10b–5 was promulgated under this statutory authority. That Rule makes it unlawful, in connection with the purchase or sale of any security,

> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact . . . , or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . . ." 17 CFR §240.10b–5.

The Court of Appeals also held that Lorenzo violated §17(a)(1) of the 1933 Act. Similar to Rule 10b–5, §17(a) of the Act provides that it is unlawful, in connection with the offer or sale of a security,

> "(1) to employ any device, scheme, or artifice to defraud, or
>
> "(2) to obtain money or property by means of any untrue statement of a material fact . . . ; or
>
> "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U. S. C. §77q(a)(1).

We can quickly dispose of Rule 10b–5(a) and §17(a)(1). The act of knowingly disseminating a false statement at the behest of its maker, without more, does not amount to "employ[ing] any device, scheme, or artifice to defraud" within the meaning of those provisions. As the contemporaneous dictionary definitions cited by the majority make clear, each of these words requires some form of planning, designing, devising, or strategizing. See *ante,* at 6. We have previously observed that "the terms 'device,' 'scheme,' and 'artifice' all connote knowing or intentional *practices*." *Aaron* v. *SEC*, 446 U. S. 680, 696 (1980) (emphasis added). In other words, they encompass "fraudulent scheme[s],"

such as a "'short selling' scheme," a wash sale, a matched order, price rigging, or similar conduct. *United States* v. *Naftalin*, 441 U. S. 768, 770, 778 (1979) (applying §17(a)(1)); see *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 473 (1977) (interpreting the term "manipulative" in §10(b)).

Here, it is undisputed that Lorenzo did not engage in any conduct involving planning, scheming, designing, or strategizing, as Rule 10b–5(a) and §17(a)(1) require for a primary violation. He sent two e-mails drafted by a superior, to recipients specified by the superior, pursuant to instructions given by the superior, without collaborating on the substance of the e-mails or otherwise playing an independent role in perpetrating a fraud. That Lorenzo knew the messages contained falsities does not change the essentially administrative nature of his conduct here; he might have *assisted* in a scheme, but he did not himself plan, scheme, design, or strategize. In my view, the plain text of Rule 10b–5(a) and §17(a)(1) thus does not encompass Lorenzo's conduct as a matter of primary liability.

The remaining provision, Rule 10b–5(c), seems broader at first blush. But the scope of this conduct-based provision—and, for that matter, Rule 10b–5(a) and §17(a)(1)—must be understood in light of its codification alongside a prohibition specifically addressing primary liability for false statements. Rule 10b–5(b) imposes primary liability on the "make[r]" of a fraudulent misstatement. 17 CFR §240.10b–5(b); see *Janus*, 564 U. S., at 141–142. And §17(a)(2) imposes primary liability on a person who "obtain[s] money or property by means of" a false statement. 15 U. S. C. §77q(a)(2). The conduct-based provisions of Rules 10b–5(a) and (c) and §17(a)(1) must be interpreted in view of the specificity of these false-statement provisions, and therefore cannot be construed to encompass primary liability solely for false statements. This view is consistent with our previous

recognition that "each subparagraph of §17(a) 'proscribes a distinct category of misconduct'" and "'is meant to cover *additional* kinds of illegalities.'" *Aaron, supra,* at 697 (quoting *Naftalin*, *supra*, at 774; emphasis added).

The majority disregards these express limitations. Under the Court's rule, a person who has not "made" a fraudulent misstatement within the meaning of Rule 10b–5(b) nevertheless could be held primarily liable for facilitating that same statement; the SEC or plaintiff need only relabel the person's involvement as an "act," "device," "scheme," or "artifice" that violates Rule 10b–5(a) or (c). And a person could be held liable for a fraudulent misstatement under §17(a)(1) even if the person did not obtain money or property by means of the statement. In short, Rule 10b–5(b) and §17(a)(2) are rendered entirely superfluous in fraud cases under the majority's reading.[2]

This approach is in tension with "'the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 645 (2012) (quoting *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U. S. 204, 208 (1932)). I would therefore apply the "old and familiar rule" that "the specific governs the general." *RadLAX*, *supra*, at 645–646 (internal quotation marks omitted); see A. Scalia & B. Garner, Reading Law 51 (2012) (canon equally applicable to statutes and regulations). This canon of construction applies not only to resolve "contradiction[s]" between general and specific provisions, but also to avoid "the superfluity of a specific provision that is swallowed by the general one." *RadLAX*, 566 U. S., at 645. Here, liability for false state-

—————————

[2] I recognize that §17(a)(1) could be deemed narrower than §17(a)(2) in the sense that it requires scienter, whereas §17(a)(2) does not. *Aaron* v. *SEC*, 446 U. S. 680, 697 (1980). But scienter is not disputed in this case, and the specific terms of §17(a)(2) are otherwise completely subsumed within the more general terms of §17(a)(1), as interpreted by the majority.

ments is "'specifically dealt with'" in Rule 10b–5(b) and
§17(a)(2). *Id.,* at 646 (quoting *D. Ginsberg & Sons*, *supra*,
at 208). But Rule 10b–5 and §17(a) also contain general
prohibitions that, "'in [their] most comprehensive sense,
would include what is embraced in'" the more specific
provisions. 566 U. S., at 646. I would hold that the provi-
sions specifically addressing false statements "'must be
operative'" as to false-statement cases, and that the more
general provisions should be read to apply "'only [to] such
cases within [their] general language as are not within
the'" purview of the specific provisions on false state-
ments. *Ibid.*

Adopting this approach to the statutory text would align
with our previous admonitions that the securities laws
should not be "[v]iewed in isolation" and stretched to their
limits. *Hochfelder*, 425 U. S., at 212. In *Hochfelder*, for
example, we concluded that the key words of §10(b) em-
ployed the "terminology of intentional wrongdoing" and
thus "strongly suggest[ed]" that it "proscribe[s] knowing or
intentional misconduct," even though the statute did not
expressly state as much. *Id.*, at 197, 214. We took a
similar approach to §17(a)(1) of the 1933 Act. *Aaron*, 446
U. S., at 695–697. We have also limited the terms of Rule
10b–5 by recognizing that it was adopted pursuant to
§10(b) and thus "encompasses only conduct already pro-
hibited by §10(b)." *Stoneridge Investment Partners, LLC* v.
*Scientific-Atlanta, Inc.*, 552 U. S. 148, 157 (2008); see
*Hochfelder*, *supra,* at 212–214.

Contrary to the suggestion of the majority, this ap-
proach does not necessarily require treating each provi-
sion of Rule 10b–5 or §17(a) as "governing different, mu-
tually exclusive, spheres of conduct." *Ante,* at 7. Nor does
it prevent the securities laws from mutually reinforcing
one another or overlapping to some extent. *Ante,* at 7–8.
It simply contemplates giving full effect to the specific
prohibitions on false statements in Rule 10b–5(b) and

§17(a)(2) instead of rendering them superfluous.

The majority worries that this approach would allow people who disseminate false statements with the intent to defraud to escape liability under Rule 10b–5. *Ante*, at 9. That is not so. If a person's only role is transmitting fraudulent misstatements at the behest of the statements' maker, the person's conduct would be appropriately assessed as a matter of secondary liability pursuant to provisions like 15 U. S. C. §§77o(b), 78t(e), and 78o(b)(4)(E). And if a person engages in *other* acts prohibited by the Rule, such as developing and employing a fraudulent scheme, the person would be primarily liable for that conduct.

The majority suggests that secondary liability may often prove illusory. It hypothesizes, for example, a situation in which the "maker" of a false statement does not know that it was false and thus does not violate Rule 10b–5(b), but the disseminator knows that the statement is false. Under that scenario, the majority fears that the person disseminating the statements could be "engaged in an egregious fraud," yet would not be liable as an aider and abettor for lack of a primary violator. *Ante,* at 12. This concern is misplaced. As an initial matter, I note that §17(a)(2) does not require scienter, so the maker of the statement may still be liable under that provision. *Aaron*, *supra*, at 695–697. Moreover, an ongoing, "egregious" fraud is likely to independently constitute a primary violation of the conduct-based securities laws, wholly apart from the laws prohibiting fraudulent misstatements. Here, by contrast, we are concerned with the dissemination of two misstatements at the request of their maker. This type of conduct is appropriately assessed under principles of secondary liability.

## B

The majority's approach contradicts our precedent in

two distinct ways.

First, the majority's opinion renders *Janus* a dead letter. In *Janus*, we held that liability under Rule 10b–5(b) was limited to the "make[r]" of the statement and that "[o]ne who *prepares or publishes* a statement on behalf of another is not its maker" within the meaning of Rule 10b–5(b). 564 U. S., at 142 (emphasis added). It is undisputed here that Lorenzo was not the maker of the fraudulent misstatements. The majority nevertheless finds primary liability under different provisions of Rule 10b–5, without any real effort to reconcile its decision with *Janus*. Although it "assume[s] that *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information," in the next breath the majority states that this would be true only if "the individual is not involved in some other form of fraud." *Ante*, at 10. Given that, under the majority's rule, administrative acts undertaken in connection with a fraudulent misstatement qualify as "other form[s] of fraud," the majority's supposed preservation of *Janus* is illusory.

Second, the majority fails to maintain a clear line between primary and secondary liability in fraudulent-misstatement cases. Maintaining this distinction is important because, as the majority notes, there is no private right of action against mere aiders and abettors. *Ante*, at 10; see *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 191 (1994). Here, however, the majority does precisely what we declined to do in *Janus*: impose broad liability for fraudulent misstatements in a way that makes the category of aiders and abettors in these cases "almost nonexistent." 564 U. S., at 143. If Lorenzo's conduct here qualifies for primary liability under §10(b) and Rule 10b–5(a) or (c), then virtually any person who assists with the making of a fraudulent misstatement will be primarily liable and thereby subject not only to SEC enforcement, but private lawsuits.

The Court correctly notes that it is not uncommon for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another—as, for example, when someone illegally sells a gun to help another person rob a bank. *Ante*, at 11. But this case does not involve two distinct crimes. The majority has interpreted certain provisions of an offense so broadly as to render superfluous the more stringent, on-point requirements of a narrower provision of the same offense. Criminal laws regularly and permissibly overlap with each other in a way that allows the same conduct to constitute different crimes with different punishments. That differs significantly from interpreting provisions in a law to completely eliminate specific limitations in a neighboring provision of that very same law. The majority's overreading of Rules 10b–5(a) and (c) and §17(a)(1) is especially problematic because the heartland of these provisions is conduct-based fraud—"employ[ing] [a] device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business"—not mere misstatements. 15 U. S. C. §77q(a)(1); 17 CFR §§240.10b–5(a), (c).

The Court attempts to cabin the implications of its holding by highlighting several facts that supposedly would distinguish this case from a case involving a secretary or other person "tangentially involved in disseminat[ing]" fraudulent misstatements. *Ante*, at 7. None of these distinctions withstands scrutiny. The fact that Lorenzo "sent false statements directly to investors" in e-mails that "invited [investors] to follow up with questions," *ibid.*, puts him in precisely the same position as a secretary asked to send an identical message from her e-mail account. And under the unduly capacious interpretation that the majority gives to the securities laws, I do not see why it would matter whether the sender is the "vice president of an investment banking company" or a secretary, *ibid.*—if the sender knowingly sent false statements,

the sender apparently would be primarily liable. To be sure, I agree with the majority that liability would be "inappropriate" for a secretary put in a situation similar to Lorenzo's. *Ibid.* But I can discern no legal principle in the majority opinion that would preclude the secretary from being pursued for primary violations of the securities laws.

\* \* \*

Instead of blurring the distinction between primary and secondary liability, I would hold that Lorenzo's conduct did not amount to a primary violation of the securities laws and reverse the judgment of the Court of Appeals. Accordingly, I respectfully dissent.