# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 21, 2011          Decided May 6, 2011

No. 10-1091

NEWTON R. DICKSON,
PETITIONER

v.

NATIONAL TRANSPORTATION SAFETY BOARD AND FEDERAL
AVIATION ADMINISTRATION,
RESPONDENTS

---

On Petition for Review of an Order
of the National Transportation Safety Board

---

*Gregory S. Winton* argued the cause and filed the briefs for petitioner.

*Susan Caron*, Attorney, Federal Aviation Administration, argued the cause for respondent. On the brief was *Autumn Killingham*, Attorney.

Before: SENTELLE, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The Federal Aviation Administration (FAA) denied Newton Dickson's application for a first-class airman medical certificate because he had a history of "disturbance of consciousness without satisfactory medical explanation" or "other seizure disorder, disturbance of consciousness, or neurologic condition." With respect to one of the incidents that led the FAA to this conclusion -- an incident aboard a passenger-carrying Boeing 757 -- the best that Dickson's own medical expert could say was that "the much more likely story is [that] he was acting like a teenager." Had the National Transportation Safety Board (NTSB) believed that expert, it might well have taken away the "teenager's" jet keys on that ground alone. Instead, it affirmed the FAA's determination that Dickson was not medically qualified to fly. We do so as well.

I

On December 20, 2006, Dickson applied for a first-class airman medical certificate pursuant to 49 U.S.C. § 44703. After a period of evaluation, FAA Federal Air Surgeon Frederick Tilton issued a denial letter in March 2008, amended in March 2009, concluding that Dickson did not meet the medical standards set out in the relevant regulations because he had "a history of disturbance of consciousness without satisfactory medical explanation, and/or other seizure disorder, disturbance of consciousness, or neurologic condition." Tilton Letter (Mar. 19, 2009) (JA 28) (citing, *inter alia*, 14 C.F.R. § 67.109(a)(2), (b)). "These findings," Tilton said, made the grant of a medical certificate "incompatible with aviation safety." *Id.*

The FAA's denial was based on two incidents that took place in the spring of 2004. As of that time, Dickson had been flying MD-80 aircraft for Continental Airlines and was training to fly the Boeing 757. On April 8, during a layover in London,

he collapsed at a restaurant. Emergency Medical Services (EMS) paramedics who arrived at the scene wrote "Convulsions/Fitting, Shivering" in their report, Emergency Call Receipt (Apr. 8, 2004) (JA 43), and further stated, among other things, that the "patient had just finished eating when he stood up and collapsed to the floor and began fitting for approx. 4 minutes," EMS Report (Apr. 8, 2004) (JA 45). Dickson was transported to the University College London Hospital, a hospital "world-renowned for its expertise in neurology." *Petition of Dickson*, NTSB Order No. EA-5517, at 4 n.3 (Apr. 9, 2010) (citing expert testimony). There, he was examined by several doctors, including Dr. Clement Loy, who discharged him the following day with the diagnosis: "generalized seizure." UCL Hosp. Discharge Record (Apr. 9, 2004) (JA 66).

One month later, Dickson was paired with Captain Frank Metzner for a Boeing 757 training flight. On the second leg of the passenger-carrying flight, from Cleveland to Las Vegas, Captain Metzner "noticed enroute degradation in his performance, and deterioration in his level of awareness and application of autoflight functions." NTSB Order at 7. According to Metzner, Dickson "stared at the computer, seemed to ignore the input procedures, and had significant problems with automation that he had not experienced earlier." *Id.* When Dickson failed to achieve a reasonable glide angle for arrival, Metzner took over the controls and assisted in the landing.

Upon arrival in Las Vegas, Metzner instructed Dickson to prepare the aircraft for the final leg to Houston. Dickson, however, "did not appear to be able to complete the tasks without assistance." *Id.* at 8. Instead:

> He stared at the computer and did not enter the take-off data for Houston. He was unable to perform some basic automation procedures . . . . He was unable to load the

> Flight Management Computer, repeatedly pushing the auto-initiation prompt, even after Captain Metzner told him where to find the correct prompt. Petitioner continued to hit the auto initiation key, repeating the phrase, 'got to load fuel.'

*Id*. When "Metzner called for the before-start checklist, [Dickson] reached for the wrong hydraulic pump . . . . After push off, when petitioner reached for the overhead panel to begin the after-start checklist procedure, 'his arm was shaking in a spastic shaking motion.'" *Id*. 8-9. Dickson again reached for the wrong switch and, according to Metzner, "was lethargic and unable to load several sets of data before take-off." *Id*. at 9.

Metzner decided to fly the last leg himself. During the flight, the "petitioner was disengaged and uninvolved; he stared straight ahead with his hands in his lap." *Id*. During arrival, he was unable to perform basic tasks. After the engines shut down, Captain Gary Small, an Assistant Chief Pilot for Continental Airlines, entered the cockpit and was present for Dickson's debriefing. According to Small, there was about Dickson "'just a very removed, detached sense that everything was slow motion, everything was disconnected.'" *Id.* at 10. Small decided to stop Dickson's training because he had "demonstrated very unusual, bizarre behavior." *Id*.

In response to the flight training incident, Dr. Michael Berry was assigned to evaluate Dickson's medical fitness. Following interviews of Dickson and Metzner, consultation with a neurologist, review of the London hospital records, and his own physical examination and laboratory tests, Dr. Berry concluded that Dickson had suffered a loss of consciousness secondary to seizure, and that he was not qualified for flying duties. Fitness for Duty Med. Eval. (Aug. 9, 2004) (JA 76-79). Based on this evaluation, as well as the other information in Dickson's

medical file, Federal Air Surgeon Tilton denied Dickson's subsequent application for a first-class airman medical certificate. Tilton Ltr. (JA 28).

Claiming that the first episode was the result of a trip, fall and concussion, and that the second was the result of inexperience, fatigue and personality conflict, Dickson appealed the denial of his application to the NTSB. *See* 49 U.S.C. § 44703(d). At the conclusion of a three-day hearing, an Administrative Law Judge (ALJ) affirmed the FAA's denial. Dickson then appealed to the Board, which affirmed the ALJ's order on April 9, 2010. Dickson now seeks judicial review pursuant to 49 U.S.C. § 1153.

II

This court must uphold an NTSB decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Chritton v. NTSB*, 888 F.2d 854, 856 (D.C. Cir. 1989). The Board's "[f]indings of fact . . . , if supported by substantial evidence, are conclusive." 49 U.S.C. § 1153(b)(3). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chritton*, 888 F.2d at 856 (internal quotation marks omitted); *see AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004). "Thus, a conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Chritton*, 888 F.2d at 856. In determining whether substantial evidence supports the NTSB's decision, we must accept "reasonable credibility determinations" made by the ALJ and approved by the Board. *Throckmorton v. NTSB*, 963 F.2d 441, 444 (D.C. 1992).

Dickson's sole contention is that the NTSB's affirmance of the denial of his medical certificate was not supported by substantial evidence. We note that in agency proceedings under 49 U.S.C. § 44703, "the burden of proof is on petitioner to establish his medical qualifications by a preponderance of reliable, probative, and substantial evidence." *Petition of Peet*, NTSB Order No. EA-4854, 2000 WL 1239201, at *3 (Aug. 24, 2000); *see* 49 C.F.R. § 821.25; Petitioner's Br. 43. Thus, to succeed in this court, Dickson has a particularly difficult burden: he must show that substantial evidence does not support the Board's determination that Dickson failed to establish his medical qualifications by a preponderance of the evidence.

In support of its denial of Dickson's application, the FAA submitted the London EMS and hospital records, the testimony of Captains Metzner and Small (as described in Part I above), Dickson's medical records, and the medical testimony of three experts. In support of his appeal, Dickson offered his own testimony, that of his London dinner companion, Sophie Myhill, and that of his own medical expert. There is no doubt that, if credited, the FAA's submissions provided substantial evidence for the denial of Dickson's application. And because Dickson has not shown that it was unreasonable for the NTSB to credit the FAA's evidence over his own, his challenge fails.

With respect to the facts of the London incident, Dickson's testimony was that he merely tripped, fell and hit his head; both he and Myhill testified that he did not have a "fit." But even Dickson concedes that neither's testimony was dispositive: Myhill "was not physically present" when he fell, and Dickson himself was "unable to provide a clear and unbiased recollection of the facts and circumstances leading up to and immediately following the fall." Petitioner's Reply Br. 15. Instead of relying on Dickson and Myhill, the ALJ credited the EMS and hospital records, which reported what witnesses to the event (including

Myhill) told medical personnel at the time: that Dickson had suffered "Convulsions/Fitting, Shivering," Emergency Call Receipt (Apr. 8, 2004) (JA 43); that he "had just finished eating when he stood up and collapsed to the floor and began fitting for approx. 4 minutes," EMS Report (Apr. 8, 2004) (JA 45); and that he "became less coherent following dinner," "fell over," and was "foaming @ mouth," Dr. Brian Kennedy, UCL Hosp., Clinical Notes (Apr. 8, 2004) (JA 70). Moreover, the NTSB noted, the ALJ "made an implicit credibility determination [against] the hearing testimony of Ms. Myhill, which contradicted other evidence attributed to her" in the medical records. NTSB Order at 20.

Dickson objects that the decision to credit the London medical records was improper because they contain reports of witness observations that constitute "unreliable hearsay." Petitioner's Reply Br. 9. As Dickson concedes, however, the NTSB's Rules of Practice provide that "'[h]earsay evidence (including hearsay within hearsay, where there are acceptable circumstantial indicia of trustworthiness) shall be admissible.'" Petitioner's Reply Br. 7 (quoting 49 C.F.R. § 821.38). The ALJ found the records trustworthy on the ground that medical personnel are trained to take statements and interview witnesses, and hence that such statements are likely to be credible. ALJ Oral Decision at 695 (Aug. 6, 2009) (JA 171). That conclusion is not unreasonable. *See generally* FED. R. EVID. 803(4) (providing that "statements for purposes of medical diagnosis or treatment" are "not excluded by the hearsay rule").

With respect to the facts of the training flight incident, although Dickson admitted that he was slow to respond to Captain Metzner's commands, he attributed it to inexperience and fatigue. Dickson Aff. 1-2 (Aug. 31, 2004) (JA 73-74). He also admitted his withdrawn behavior, but attributed that to a personality conflict with Captain Metzner. Dickson Aff. 1-2

(June 7, 2005) (JA 61-62); *see* Petitioner's Br. 25. The ALJ, however, "made an explicit credibility determination in favor of Captain Metzner and against petitioner." NTSB Order at 18. That is a determination that we "cannot reexamine," as there is no ground for finding it "unreasonable," *Throckmorton*, 963 F.2d at 444.[1]

Finally, with respect to the medical explanation for Dickson's behavior, Dickson's expert -- board-certified neurologist Dr. Brian Loftus -- opined that Dickson did not have a seizure in London, but instead merely suffered a mild concussion caused by a trip and fall at the restaurant. Loftus Expert Report at 2 (JA 38); ALJ Hr'g Tr. at 585 (Aug. 6, 2009) (JA 451). He also opined that Dickson did not suffer a seizure on the training flight, concluding that "the more likely story is, you know, he was acting like a teenager." ALJ Hr'g Tr. at 188 (Aug. 4, 2009) (JA 227). When asked to explain what this meant, Loftus elaborated as follows:

> "I don't know if you have a teenager. . . . There are times you try to talk to them and they just don't answer you. You say their name a second time, and they still don't answer you. And then you kind of get in their face and then they answer you, shout at you, storm off to their room. They don't talk to you for a while. My

---

[1]The ALJ's determination was based in part on his comparative assessment of Metzner's and Dickson's testimony, and in part on his finding that Dickson plainly did not tell the truth about a letter he had sent to Metzner. Although Dickson "vehemently denied" authorship of the letter, the ALJ found that Dickson was "the only one [who] would have known the information" it contained, and that "the signature on th[e] letter is exactly the same" as several other Dickson signatures in the record. ALJ Oral Decision at 698 (JA 174).

son and I get along now that he's 19, but we went through that phase. Obviously in a cockpit he can't storm off. So there's times he's just ignoring the guy. That's sort of what [Dickson] describes. I think that's probably true.

*Id*.

Dr. Loftus' opinion was contrary to that of the FAA's three medical experts. Board-certified neurologist Dr. John Hastings opined that Dickson had experienced a generalized seizure in London and a series of complex partial seizures during the training flights. ALJ Hr'g Tr. at 481, 493-94 (Aug. 5, 2009) (JA 382, 394-95). Board-certified neurologist Dr. Willard Hauser opined that Dickson had a generalized seizure in London and a prolonged partial seizure during the flights. ALJ Hr'g Tr. at 404, 418, 422-23 (Aug. 5, 2009) (JA 320, 332, 335-36). And Dr. James DeVoll, Board-certified in aerospace medicine and the manager of the Medical Appeals Branch of the FAA's Office of Aerospace Medicine, concluded that Dickson offered "no satisfactory medical explanation for any disturbance of consciousness." NTSB Order at 18.

As Dickson concedes, "[t]here is clearly a difference of medical opinion as to whether [he] experienced a seizure or a concussion at the restaurant on April 8, 2004," with the FAA's experts opining as to the former and Dickson's expert opining as to the latter. Petitioner's Br. 53. Likewise, there is clearly a difference in opinion as to whether he experienced a seizure or merely acted like a teenager on the Boeing 757 training flight. But a difference of opinion is not enough to show that the NTSB lacked substantial evidence for its decision. As we noted at the outset, "a conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Chritton*, 888 F.2d at 856.

Moreover, the NTSB had a perfectly reasonable basis for choosing the opinion of the FAA's experts over that of Dr. Loftus.  As Loftus explained, his opinion regarding the London incident was "based upon the eye witness accounts of the event which stated that he tripped, struck his head, and there was no apparent epileptic activity."  Loftus Ltr. (JA 53).  But the only witness who said Dickson tripped and struck his head was Dickson himself; and the only witnesses who said there was no apparent epileptic activity were Dickson and Myhill.  Similarly, Dr. Loftus' opinion regarding the training flight was substantially based on "Dickson's explanation of the events."  *Id*.  Because the NTSB reasonably rejected the version of the facts upon which Dr. Loftus relied for his opinion, it reasonably rejected that opinion as well.  Indeed, noting that Captain Metzner's version of what happened during the training flight was more credible than Dickson's, the ALJ declared himself "not particularly impressed by Dr. Loftus' characterization of [Dickson] acting like a teenager."  ALJ Oral Dec. at 698 (JA 174).  We have no basis for second-guessing that judgment.

III

For the forgoing reasons, the petition for review is

*Denied.*