# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 11, 2019          Decided July 12, 2019

No. 18-1160

KORNITZKY GROUP, LLC, D/B/A AEROBEARINGS, LLC,
PETITIONER

v.

DANIEL K. ELWELL, ACTING ADMINISTRATOR, FEDERAL
AVIATION ADMINISTRATION AND NATIONAL TRANSPORTATION
SAFETY BOARD,
RESPONDENTS

On Petition for Review of an Order of
the National Transportation Safety Board

*Jana Yocom Rine* argued the cause for petitioner. With her
on the briefs were *Elizabeth M. Candelario* and *Kathleen A.
Yodice*.

*Christian A. Klein* was on the brief for *amicus curiae*
Aeronautical Repair Station Association in support of
petitioner.

*Christopher R. Stevenson*, Senior Attorney, Federal
Aviation Administration, argued the cause and filed the brief
for respondent.

Before: SRINIVASAN, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  In 2018, the National Transportation Safety Board revoked the air agency certificate held by Kornitzky Group.  The certificate authorized Kornitzky Group to operate as a repair station that performs maintenance on bearings used in jet engines.  The Board revoked Kornitzky Group's certificate based on two distinct set of allegations.  First, the Board found that Kornitzky Group had violated aviation safety regulations by repairing engine bearings without technical data necessary to ensure it was conducting the repairs properly.  Second, the Board determined that Kornitzky Group intentionally falsified maintenance records by representing only that it had inspected the engine bearings without indicating that it had also disassembled and repaired them.

Kornitzky Group seeks review of the Board's decision.  We uphold the Board's determination concerning Kornitzky Group's performance of maintenance without the appropriate technical data.  But we set aside the Board's intentional-falsification charge because the Board departed from its own precedents when considering whether Kornitzky Group had acted with the requisite knowledge.  We thus vacate the Board's revocation of Kornitzky Group's air agency certificate.

3

I.

A.

Kornitzky Group, LLC, was founded in 2010 by two engineers, Michael Kornitzky, who has since passed away, and Zev Galel. The company performed maintenance on turbine engine bearings used in jet engines. The bearings are structural components of an engine that connect other components and minimize friction, enabling the engine to function as designed.

In August 2011, the FAA issued Kornitzky Group an air agency certificate, which authorized the company to inspect and clean turbine engine bearings. Between 2011 and 2012, Kornitzky Group applied for and received additional ratings allowing it to perform repairs on engine bearings in accordance with a military specification it presented to the FAA. With the additional ratings, the company not only could inspect and clean bearings, but also could disassemble bearings, clean and polish their parts, reassemble the bearings, and then certify them for return to service.

In December 2015, Gary Watson, an FAA Principal Maintenance Inspector, conducted a three-day inspection of Kornitzky Group, during which Watson "did not find any discrepancies or anomalies." Letter from Gary M. Watson to Zev Galel (Dec. 14, 2015), J.A. 140. Nine months later, the FAA received two complaints about the technical data used by Kornitzky Group to conduct repairs. The complaints prompted the agency's Flight Standards District Office to forward the proposed repair data provided by Kornitzky Group in 2012—i.e., the military specification—to the agency's Engine Certification Office. The Certification Office determined that Kornitzky Group's data was not specific enough to support the repair of turbine engine bearings.

On March 24, 2017, Darren Pittacora, who had replaced Watson as the FAA's Principal Maintenance Inspector for Kornitzky Group, sent the company a letter advising that the agency had incorrectly issued one of Kornitzky Group's ratings in 2012, in part because the District Office had not forwarded the proposed data to the Certification Office for review. The letter advised Kornitzky Group that it had 10 days to submit to reinspection under 49 U.S.C. § 44709 or face suspension of its license.

In May 2017, Pittacora and Dr. Chip Queitzsch, the FAA's Chief Scientific and Technical Advisor for Engine System Dynamics, among other officials, conducted the reinspection. On March 1, 2018, the FAA notified Kornitzky Group that the results of the reinspection were unsatisfactory because the company had exceeded the scope of work permitted by the original equipment manufacturer (OEM) and the relevant military specification.

That same day, the FAA issued an emergency order revoking Kornitzky Group's air agency certificate. The order rested on two distinct sets of alleged violations. First, the FAA alleged that, by disassembling and repairing engine bearings without the requisite technical data, Kornitzky Group had violated several maintenance regulations (namely, 14 C.F.R. §§ 43.13(a), 145.201(b), 145.201(c)(1), and 145.201(c)(2)). Second, the FAA alleged that Kornitzky Group had intentionally falsified statements in its repair station records when approving bearings for return to service, in violation of 14 C.F.R. § 145.12(a). The intentional-falsification charge related to four work orders documented on an FAA form, Form 8130-3. The FAA contended that Kornitzky Group had indicated on the Form 8130-3 only that it had inspected engine bearings without indicating the other work it had performed in

connection with the bearings (e.g., disassembly, polishing, and reassembly).

B.

In April 2018, an administrative law judge from the National Transportation Safety Board, an independent agency that adjudicates FAA enforcement actions, conducted a four-day evidentiary hearing. The FAA presented Pittacora and Queitzsch as its primary witnesses, with Queitzsch testifying as an expert. Kornitzky Group presented Galel, the company's sole principal, and Emanuel Branzai, its own expert.

The administrative law judge first found that Kornitzky Group had violated each of the maintenance regulations because the company was unable to produce the technical data that supported its additional ratings for disassembly and repair of bearings. The administrative law judge rejected the intentional-falsification claim, however, because Pittacora testified that Kornitzky Group's statements on the Form 8130-3s were not false when examined alone. The judge thus determined that the appropriate sanction was to suspend Kornitzky Group's certificate pending compliance, rather than permanently revoke it.

Both Kornitzky Group and the FAA appealed to the Board. *See Elwell v. Kornitzky Grp., LLC*, NTSB Order No. EA–5840, 2018 WL 2733940 (May 11, 2018) [hereinafter Board Decision]. The Board affirmed the administrative law judge's conclusion that Kornitzky Group had violated the maintenance regulations by conducting disassembly and repair of bearings without the necessary technical data. *Id.* at *10–11. The Board, though, reversed the administrative law judge with regard to the intentional-falsification claim, ruling that the FAA had proved that charge. *Id.* at *7–10.

The Board found that Kornitzky Group's selective disclosure of information rendered the Form 8130-3s false because the company had excluded other information in a way that gave an incomplete and misleading impression of the work it had performed. The Board further found that the company acted with knowledge of that falsity. *Id.* The Board decided that the intentional-falsification charge warranted revocation of Kornitzky Group's certificate because it called into question the company's "care, judgment, and responsibility." *Id.* at *12 (citation omitted).

## II.

We sustain a Board decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dickson v. NTSB*, 639 F.3d 539, 542 (D.C. Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). Kornitzky Group seeks a reinstatement of its air agency certificate, arguing that the Board acted arbitrarily and capriciously in finding violations of the FAA's maintenance and intentional-falsification regulations. We uphold the Board's determination that Kornitzky Group violated the FAA's maintenance regulations, but we set aside the Board's finding that the company intentionally falsified its entries on FAA Form 8130-3. We therefore vacate the Board's revocation of the company's air agency certificate.

## A.

The Board determined that Kornitzky Group's repairs violated certain FAA maintenance regulations: 14 C.F.R §§ 43.13(a), 145.201(b), 145.201(c)(1), and 145.201(c)(2). Section 43.13(a) requires that each person performing maintenance must "use the methods, techniques, and practices prescribed in the current manufacturer's maintenance

manual . . . or other methods, techniques, and practices acceptable to the Administrator." *Id.* § 43.13(a).

The remaining regulations impose requirements pertaining to "technical data." Technical data refers to the engineering drawings and specifications "needed to define the configuration and design features" of aircraft engines, including the dimensions necessary to determine the airworthiness of any altered or repaired aircraft article. Fed. Aviation Admin., *Collins Interpretation*, 2011 WL 1459993, at *2 (Apr. 8, 2011). Section 145.201(b) provides that a "certificated repair station . . . may not maintain or alter any article for which it is rated if it requires special technical data . . . that are not available to it." 14 C.F.R. § 145.201(b). Section 145.201(c)(1) similarly establishes that a "certified repair station may not approve for return to service" any article that is repaired without acceptable technical data. *Id.* § 145.201(c)(1). And § 145.201(c)(2) parrots § 145.201(c)(1), except that it requires pre-approved (rather than acceptable) technical data for a "major repair or major alternation." *Id.* § 145.201(c)(2).

The Board reasonably determined that Kornitzky Group violated each of those regulations. During the reinspection, the FAA's inspection officials asked Kornitzky Group about the process it used for inspecting and repairing bearings. For each of the work orders at issue in this case, Kornitzky Group disassembled the bearing to inspect its parts with a stylus or scribe, looking for scratches, dents, pits, or depressions. In each instance, the bearing failed the initial inspection because it exhibited signs of burnishing, pitting, staining, or scratching. Kornitzky Group then polished and "lapped" the bearing parts (i.e., used an abrasive to smooth the parts' surfaces) to remove the imperfections and then reassembled the bearing. That process necessarily removes material from the bearing.

By performing those functions, Kornitzky Group came into conflict with the maintenance regulations. First, the pertinent OEM manuals for the bearings prohibited disassembly, which means Kornitzky Group's maintenance procedures violated § 43.13(a) unless it had other "acceptable" maintenance procedures, which it did not. Second, Kornitzky Group had no way to determine whether the amount of bearing material it removed sufficed to jeopardize the bearings' airworthiness because it had no access to the appropriate technical data, in violation of the § 145.201 regulations. The company could not produce the technical data because the data, according to the company, was stored in a computer once owned by its founder Mike Kornitzky and no longer in the company's possession.

Kornitzky Group now argues that the military specification cited in its ratings fulfills the requirements of § 145.201 and § 43.13(a). With regard to § 145.201, however, the military specification does not itself contain the kind of substantive technical data required by that provision. Instead, the specification incorporates OEM technical data, stating: "The need for maintaining the latest technical data in a readily available state cannot be overemphasized. It shall be the responsibility of the bearing shop . . . to obtain all drawings pertaining to bearings prior to induction in the shop for processing." Military Specification T.O. 44-B-1-122, Ex. A-33, R. 1366. Because the military specification relies on the possession of OEM technical data—which the company does not possess—the Board appropriately determined that the military specification did not itself satisfy § 145.201.

With regard to § 43.13(a), Kornitzky Group is correct that the FAA approved use of the military specification when it issued the company's additional ratings in 2012. But Kornitzky Group did not perform the work in accordance with

the specification. The specification requires maintenance providers to compare repaired bearings to tolerance drawings, which Kornitzky failed to do. Also, the military specification provides it is "only to be used on bearings designed to be completely disassembled. The bearing drawing or the original component technical manual should specify that the rolling elements are removable." Military Specification T.O. 44-B-1-122, Ex. A-30, R. 1363. But the OEM manuals of the bearings repaired by Kornitzky Group indicate the opposite, that the bearings should not be disassembled. Therefore, even if the military specification may be, in a vacuum, an "acceptable" alternative method under § 43.13(a), Kornitzky still violated that regulation by failing to comply with the specification when performing its work.

That leaves one narrow argument advanced by Kornitzky Group, pertaining solely to § 145.201(c)(2). That regulation, as noted, prohibits returning an article to service after a "major repair" unless the repair was performed in accordance with pre-approved technical data. Kornitzky Group argues that its maintenance functions did not qualify as "major repairs." The Board reasonably concluded otherwise.

A major repair is any repair "[t]hat, if improperly done, might appreciably affect weight, balance, structural strength, performance, powerplant operation, flight characteristics, or other qualities affecting airworthiness." 14 C.F.R. § 1.1. At the hearing, the FAA's witnesses testified that Kornitzky Group's repairs could affect the bearing's airworthiness: "Anytime that you change the characteristics of the bearing that affect its life and its load-carrying capability [as Kornitzky Group did], you introduce the potential for the bearing to fail in service when it shouldn't, and that means loss of the engine, loss of thrust. You change the performance characteristics of the aircraft, and it puts you at risk of an accident." Hearing Tr.

359, J.A. 187. Additionally, another regulation provides an illustrative list of major repairs, including "[s]pecial repairs to structural engine parts by welding, plating, metalizing, or other methods" as a type of "powerplant major repair[]." 14 C.F.R. part 43, App. A(b)(2)(iii). And the FAA's witnesses testified at the hearing that bearings were "structural engine parts." Hearing Tr. 29–30, R. 216–17. What is more, Kornitzky Group contracted to have "plating" performed on two of the four bearings.

Kornitzky Group points to an FAA staff manual, which does not specifically list engine bearings as a structural engine part or as a "main section[]" of an engine. *See* FAA Order 8900.1, Vol. 4, Ch. 14, Sec. 12, ¶¶ 4-1622, 4-1623. But Kornitzky Group did not rely on the staff manual before either the administrative law judge or the Board, meaning we are restricted from reviewing the argument absent good cause, which Kornitzky Group has not established. 49 U.S.C. § 1153(b)(4); *see Gorman v. NTSB*, 558 F.3d 580, 591 (D.C. Cir. 2009). In any case, the cited provisions of the manual are illustrative and do not purport to establish exhaustive lists of either major repairs or structural engine parts. In the end, the record adequately supports the Board's finding that Kornitzky Group's repairs fall within the FAA's regulatory definitions of major repairs.

## B.

Kornitzky Group next challenges the Board's finding of intentional falsification. The relevant regulation, 14 C.F.R. § 145.12(a)(1)(ii), prohibits making any "intentionally false entry" in maintenance records. The three elements of an intentional-falsification charge are: (i) a false representation; (ii) in reference to a material fact; (iii) made with knowledge of its falsity. *See Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir.

1976). Although we affirm the Board's finding of material falsity for purposes of the first two elements, we conclude with regard to the third element that the Board failed to make a finding of subjective knowledge as required by its own precedent.

1.

The Board alleged that Kornitzky Group intentionally falsified entries on four Form 8130-3s. In those forms, the company certified bearings as airworthy and authorized their return to service. Box 11 of the form is titled "Status/Work" and allows space for a short description of the maintenance conducted. FAA Form 8130-3s, Authorized Release Certificates, J.A. 68, 87, 106, 123. On each form, Kornitzky Group completed Box 11 with an entry stating: "OVERHAULED." *Id.*

Box 12 of Form 8130-3, entitled "Remarks," contains space for more extensive comments. Agency guidance provides further direction about Box 12: "Describe the work identified in Block 11 and associated results necessary for the user or installer to determine the airworthiness of the product or article in relation to the work being certified." FAA Order 8130.21H, § 3-6(l). On one of the four forms, Kornitzky Group wrote in Box 12, in relevant part, "Work performed [in accordance with OEM manual] CFM56-7B ESM, CFMI-TP-SM.10, Bearing Inspection Section 72-09-01. Rev. 55, Dated 15JAN2017 and other data acceptable to or approved by the FAA. Work performed met the overhaul requirements [in accordance with] Part 14 C.F.R § 43.2." FAA Form 8130-3, Authorized Release Certificate, Work Order 107750 (May 12, 2017), J.A. 106. The other forms contain essentially that same entry but substitute the appropriate OEM manual for the particular bearing at issue.

Kornitzky Group's Box 12 entries were reasonably deemed to have been false in two ways. First, a fair interpretation of Kornitzky Group's entry "Work performed [in accordance with OEM] CFM56-7B ESM, CFMI-TP-SM.10, Bearing Inspection Section 72-09-01" is that the company's repairs complied with the manufacturer's guidelines. But while the company adhered to the referenced *inspection* section of the OEM manual, other sections of the manual prohibit *disassembly* of the bearings, yet Kornitzky Group disassembled each bearing at issue. The Board thus reasonably concluded that Kornitzky Group's representation was false, and materially so, in that it was "capable of influencing a decision of the FAA inspector." *Thunderbird Propellers, Inc. v. FAA*, 191 F.3d 1290, 1296 (10th Cir. 1999) (internal quotation marks omitted).

Second, Kornitzky Group cited only the inspection section of the OEM manual. Each OEM manual, though, also has a separate section addressing repair, refurbishment, and overhaul of bearings. Kornitzky Group failed to cite those sections even though it not only inspected the bearings, but also repaired them. The Board reasonably determined that the company, by omitting any reference to the repair section and only citing the inspection section, failed to "[d]escribe the work . . . necessary for the user or installer to determine the airworthiness of the product or article," as required by Box 12. FAA Order 8130.21H, § 3-6(l).

Granted, certain clues on the certification forms suggest that Kornitzky Group did more than inspect the bearings. Box 11 notes that the bearings were overhauled, and each Box 12 entry notes that the "[w]ork performed met the overhaul requirements" of 14 C.F.R. § 43.2. FAA Form 8130-3s, Authorized Release Certificates, J.A. 68, 87, 106, 123. But clues are not enough: as the Board explained, customers

assume that repair records are "scrupulously accurate," and the certifications here, the Board permissibly concluded, "provide[d] a false sense of confidence in the maintenance work performed." Board Decision at *7–8.

In that respect, the Board's decision was substantially supported by the testimony of Pittacora, the FAA's principal inspector for Kornitzky Group. He explained that, even if portions of the Box 12 entry were true, the entry was materially false because it misled customers: "[T]he reason I think it's false and intentional is because . . . there's lot of work that gets done there that's not documented on there, that the end user should be made aware of to make a reasonable assumption of airworthiness prior to installing it in a large turbo engine." Hearing Tr. 420, J.A. 195. The agency's conclusion that Kornitzky Group made materially false entries in documenting its critical aircraft maintenance functions thus was not arbitrary.

It bears noting that the regulations include a provision addressing material omissions in addition to the one addressing material falsifications. *See* 14 C.F.R. § 145.12(b). We have no occasion here to address the precise interrelationship between those provisions, and we do not suggest that every material omission under § 145.12(b) necessarily amounts to a material falsification under § 145.12(a). But there is also no reason to assume that the regulations occupy mutually exclusive ground. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019). For present purposes, it is enough to conclude that Kornitzky Group's entries on Form 8130-3 were incomplete in a manner reasonably found to have been materially false.

In sum, the FAA required Kornitzky Group to disclose any maintenance affecting the airworthiness of the bearings. The Board permissibly concluded that Kornitzky Group made a

materially false representation by referencing some but not all of its work affecting the bearings' airworthiness.

2.

While we sustain the Board's finding of material falsity, we cannot sustain the Board's conclusion that Kornitzky Group acted knowingly. Under its own precedent, the Board was required to find that Galel, Kornitzky Group's owner and sole principal, correctly understood the Form 8130-3 requirements but still instructed his company to provide a false response. Galel's subjective knowledge, however, was not addressed by the administrative law judge and the Board did not make the required factual finding. As a result, we must vacate the Board's intentional-falsification charge.

Our starting point is our decision in *Dillmon v. NTSB*, 588 F.3d 1085 (D.C. Cir. 2009). Jack Dillmon applied to the FAA for a medical certificate enabling him to become a pilot. *Id.* at 1087. One of the questions on the form asked whether Dillmon had any "[h]istory of nontraffic conviction(s) (misdemeanors or felonies)." *Id.* (alteration in original) (quoting FAA Form 8500-8). Dillmon answered no, even though he had recently been convicted of felony bribery. The FAA charged him with intentional falsification. *Id.* at 1088. The administrative law judge credited Dillmon's testimony that he thought the question covered only drug- or alcohol-related offenses. *Id.* at 1088–89. The Board reversed the administrative law judge because Dillmon "clearly knew that he had been convicted of a non-traffic offense," notwithstanding Dillmon's testimony that he misunderstood the question. *Id.* at 1093 (internal quotation marks omitted).

We reversed the Board because it had deviated from its own precedent. Citing *Administrator v. Reynolds*, NTSB Order

No. EA-5135, 2005 WL 196535 (Jan. 24, 2005), we held that Board precedent "require[d] the FAA to prove the airman subjectively understood what the question meant." *Dillmon*, 588 F.3d at 1094. By relying only on Dillmon's knowledge of his conviction, we concluded, the Board's analysis had skipped the necessary step of determining whether Dillmon understood that the form required him to disclose the conviction. *See id.*

We have consistently enforced that principle. In *Singleton v. Babbitt*, 588 F.3d 1078, 1085 (D.C. Cir. 2009), for instance, we reversed the Board's revocation of a pilot's license on an intentional-falsification charge where the pilot had no opportunity to testify about his understanding of the relevant question. And in *Manin v. NTSB*, 627 F.3d 1239, 1244 (D.C. Cir. 2011), we again reversed the Board's intentional-falsification charge because the Board had failed to consider testimony that the pilot did not think the medical-certificate application required him to disclose his disorderly conduct convictions.

The Board of course is free to change course and depart from its own precedents if it stays within the bounds of its statutory authority. But the agency must recognize it is doing so and provide a reasoned justification. Without such an explanation, we have no way of ensuring that the Board's "policies and standards are being deliberately changed, not casually ignored." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (internal quotation marks omitted).

There is no indication that the Board intends to abandon its subjective-knowledge requirement. To the contrary, the Board has applied that requirement not only in medical cases like *Dillmon* but also in mechanic cases like this one. In *Acting Administrator v. Reynolds*, NTSB Order No. EA-5641, 2012 WL 5954694 (Oct. 25, 2012), the Board recognized that

"credibility findings from . . . law judges are necessary in intentional falsification cases, because the Board must consider a respondent's subjective understanding of questions on medical certificate applications." *Id.* at *4. The Board found that approach equally "applicable in . . . mechanic logbook falsification case[s]" and relied upon it to reject an intentional-falsification charge brought by the FAA. *Id.*

Here, Galel's testimony suggests that he believed Box 12 only required Kornitzky Group to disclose the final inspection, not the work preceding it. He testified that the Form "8130 is not intended to have all of the information in block 12. It's supposed to show of the information, representative information, sufficient information. And there's no—the word of divulging does not—cannot be contained in that small block 12. If I had to divulge everything that I did, I would have to put all of this in every block 12." Hearing Tr. 654, J.A. 215. He continued, "the block 12 on the 8130s does not require the total list of everything that we use to perform the maintenance." *Id.*

In the context of Galel's testimony to that effect, the Board could not find the subjective-knowledge standard satisfied without also finding Galel's testimony to be non-credible. But the administrative law judge made no such determination (because he concluded the entries on the forms were not false). When the Board overturned the administrative law judge's falsity finding, then, it should have remanded the case to the administrative law judge to make the credibility determination required by its precedents.

The Board did not follow that course. Instead, it "expressly expand[ed] the Board's 'willful disregard' standard from *Administrator v. Boardman*, *Administrator v. Cooper*, and *Administrator v. Taylor*." Board Decision at *10

(footnotes omitted). Under that standard, when "an airman intentionally chooses not to carefully read the question for which he is providing an answer that he certifies by his signature to be true, a factfinder can infer 'actual knowledge' from a willful disregard for truth or falsity." *Cooper v. NTSB*, 660 F.3d 476, 484 (D.C. Cir. 2011).

In *Boardman*, for example, the applicant testified, "I did not read [the question]. I just glanced over it." *Acting Administrator v. Boardman*, NTSB Order No. EA-4514, 1996 WL 748190, at *2 (Dec. 20, 1996). In *Cooper*, the applicant "admitted that it was a 'big mistake' to fail to read the question, and that, if he had read it, he would have answered 'Yes.'" *Administrator v. Cooper*, NTSB Order No. EA-5538, 2010 WL 3358808, at *2 (Aug. 18, 2010). And in *Taylor*, similarly, the applicant admitted he "chose not to read any of the 25 items . . . contained within question 18 . . . [and] testified had he read the question, he would have checked 'yes.'" *Acting Administrator v. Taylor*, NTSB Order No. EA-5611, 2012 WL 158766, at *3 (Jan. 9, 2012).

In this case, by contrast, there was no testimony about how closely Galel had read Form 8130-3. Nor does the form itself give us reason to assume Galel willfully disregarded its instructions. The form simply provides a place for "Remarks" and says nothing else. FAA Form 8130-3s, Authorized Release Certificates, J.A. 68, 87, 106, 123. And the FAA's guidance about the form, which instructs a repair station only to describe any work necessary to determine airworthiness, does not solve the problem. *See* FAA Order 8130.21H, § 3-6(l). Galel could have reasonably (even if incorrectly) assumed that disclosing the final OEM inspection is all that is needed to determine airworthiness, especially given that Kornitzky Group had passed prior Administration inspections that way.

In short, the Board identified no evidence that Galel had intentionally disregarded the Form 8130-3 instructions, and the Board thus could not rely on any "willful disregard" principle to satisfy the subjective-knowledge standard required by its precedents. The Board's departure from its precedent falls short of reasoned decision-making. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003).

The FAA observes that the Board can set aside an administrative law judge's findings as arbitrary and capricious, reweigh the evidence, and make its own factual findings, as long as the new findings are supported by substantial evidence. *See Dillmon*, 588 F.3d at 1095. That may be true, but here, the administrative law judge never determined whether Galel subjectively understood the requirements of Form 8130-3. *See* Board Decision at *9, *22. And in any event, we can affirm the Board's decision only on the grounds upon which it acted: Galel's alleged willful disregard for the instructions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). On that score, the Board nowhere in its decision purported to reweigh the evidence and find that Galel subjectively understood the Box 12 requirements. The Board concluded only that "[t]he evidence taken together suggests that [Galel] knew the information provided on the forms in question was not complete." Board Decision at *10. That is no different than the Board's argument in *Dillmon* that Dillmon had acted knowingly because he "knew he had been convicted of a non-traffic offense." *Dillmon*, 588 F.3d at 1093 (internal quotation marks omitted). The argument failed then, and it fails again today.

## C.

Our vacatur of the Board's intentional-falsification finding requires us to vacate the Board's revocation of Kornitzky

Group's air agency certificate. FAA guidance allows for two types of remedial sanctions: (i) revocation, and (ii) indefinite suspension pending compliance. FAA Order 2150.3B at 7-1 to 7-3. Revocation is appropriate when the FAA determines that the individual or company "lacks the qualifications to hold the certificate," such as when its conduct demonstrates "a lack of the degree of care, judgment, or responsibility" required of a certificate holder. *Id.* at 7-2. Meanwhile, indefinite suspension pending compliance is appropriate when "there is a need temporarily to suspend the privileges of the certificate or rating pending demonstration of qualification or compliance with statutory or regulatory requirements." *Id.* at 7-1 to 7-2.

The Board held that Kornitzky Group's intentional falsification warranted revocation of the company's certificate because it undermined the company's "care, judgment, and responsibility." Board Decision at *12 (internal quotation marks omitted). But because we vacate the Board's intentional-falsification charge, revocation of the certificate can no longer rest on that rationale.

The Board further found that "revocation is appropriate for the remaining violations" for two reasons, neither of which withstands scrutiny. *Id.* The Board first concluded that indefinite suspension must originate with the FAA as the charging agency rather with than the Board. But the Board's own precedent indicates otherwise. *See Acting Administrator v. Air Trek, Inc.*, NTSB Order No. EA-5440, 2009 WL 1157988, at *10 (Apr. 21, 2009) (affirming administrative law judge's reduction of sanction from revocation to indefinite suspension). And the Aviation Act grants the Board authority to "amend, modify, or reverse" an FAA order as air safety requires. 49 U.S.C. § 44709(d)(1).

The Board additionally observed that the technical data at issue is "irrevocably lost" and that imposing an indefinite sanction pending compliance would "put both parties in an endless, repeating loop." Board Decision at *12. In that regard the Board evidently equated the required technical data with the data on the lost Kornitzky computer. But the record confirms that the company can acquire technical data in other ways. Queitzsch testified that Kornitzky Group could license the technical data directly from the OEM, as is typically done. Or, as Queitzsch testified, the company could develop the technical data itself by "reverse engineering" it (a contention confirmed by Galel). Hearing Tr. 310, 555, J.A. 171, 207. And in oral argument, the FAA conceded that Kornitzky Group could license the technical data from the OEM for the right price or reverse engineer the data itself. Oral Arg. Tr. 9. It would be up to Kornitzky Group to decide whether to obtain the required technical data as a means of ending an indefinite suspension of its certificate.

\* \* \* \* \*

For the foregoing reasons, we grant Kornitzky Group's petition for review in part, vacate the sanction imposed by the Board, and remand the matter for further consideration consistent with this decision.

*So ordered.*