**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 13, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DENNIS J. MALOUF,

     Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION,

    Respondent.

No. 16-9546

_____

**Petition for Review from an Order of the**
**Securities & Exchange Commission**
**(SEC No. 3-15918)**
_____

Kenneth F. Berg, Ulmer & Berne LLP, Chicago, Illinois (Alan M. Wolper
and Heidi E. VonderHeide with him on the briefs), for Petitioner.

Daniel Aguilar, Attorney, Appellate Staff, Civil Division, United States
Department of Justice, Washington, D.C. and Lisa Helvin, Senior Counsel,
Securities and Exchange Commission, Washington, D.C. (Chad A. Readler,
Acting Assistant Attorney General, Mark R. Freeman, Attorney, and Joshua
A. Salzman, Attorney, Appellate Staff, Civil Division, United States
Department of Justice, Washington, D.C.; Michael A. Conley, Solicitor,
and Dominick V. Freda, Assistant General Counsel, Securities and
Exchange Commission, Washington, D.C., with them on the briefs), for
Respondent.
_____

Before **BRISCOE**, **HARTZ**, and **BACHARACH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Mr. Dennis Malouf occupied key roles at two firms. One of the firms (UASNM, Inc.) offered investment advice; the other firm (a branch of Raymond James Financial Services) served as a broker-dealer. Raymond James viewed those dual roles as a conflict, so Mr. Malouf sold the Raymond James branch. But the structure of the sale perpetuated the conflict. Because Mr. Malouf did not disclose perpetuation of the conflict, administrative officials sought sanctions against him for violating the federal securities laws.

An administrative law judge found that Mr. Malouf had violated the Securities Exchange Act of 1934, the Securities Act of 1933, the Investment Advisers Act of 1940, Rule 10b–5, and Rule 206(4)–1. Given these findings, the judge imposed sanctions. The SEC affirmed these findings and imposed additional sanctions, including disgorgement of profits.

Mr. Malouf appeals the SEC's decision, and we affirm.

## Background

I.  **Mr. Malouf sells the Raymond James branch and uses that branch to execute trades for UASNM's clients.**

In 2007, Raymond James became concerned about the conflict of interest between (1) Mr. Malouf's role at its branch office and (2) his role at UASNM. These concerns led Raymond James to ask Mr. Malouf to choose between the two roles. Mr. Malouf opted to remain at UASNM and

sold his Raymond James branch to Mr. Maurice Lamonde for roughly $1.1 million, to be paid in installments based on the Raymond James branch's collection of securities-related fees.[1]

To facilitate the installment payments, Mr. Malouf routed bond trades on behalf of his UASNM clients through the Raymond James branch. This way, Mr. Lamonde would receive enough in commissions to allow him to pay what he owed Mr. Malouf.[2]

While Mr. Malouf was routing bond trades to the Raymond James branch, he regularly failed to seek competing bids for the trades. Mr. Malouf conceded that he should have sought competing bids: UASNM's compliance procedures required firm personnel to solicit bids from three different broker-dealers before placing a trade, and Mr. Malouf admitted

---

[1]    The written agreement does not state a specific dollar figure for the sale. The written agreement instead provides that Mr. Lamonde would pay 40% of securities-related fees that the Raymond James branch collected over a four-year period. But Mr. Malouf testified that he and Mr. Lamonde had agreed that upon payment of $1.1 million, they would consider the purchase price fully paid.

[2]    The Raymond James branch collected $1,074,454 in commissions on UASNM bond transactions. With these commissions, Mr. Lamonde ultimately paid Mr. Malouf $1,068,084 to buy the Raymond James branch.

3

that he probably could have received better prices for his clients through competing bids.

## II. UASNM makes misstatements concerning Mr. Malouf's conflict of interest, and he does not correct these misstatements.

Mr. Malouf bore responsibility for preparing UASNM's forms to be filed with the SEC (referred to as "Forms ADV")[3] and ensuring the accuracy of the UASNM website. But UASNM delegated compliance with these responsibilities to a chief compliance officer and hired an outside consultant to review UASNM's compliance procedures and Forms ADV.

Mr. Malouf later acknowledged that his financial arrangement with Mr. Lamonde had created a conflict of interest that should have been disclosed. But Mr. Malouf did not disclose that arrangement to UASNM's chief compliance officer or the outside consultant. Because these individuals did not know the details of the Malouf-Lamonde arrangement, UASNM not only failed to disclose Mr. Malouf's conflict of interest but also boasted that (1) UASNM's employees were not receiving any commissions or fees from the Raymond James branch and (2) UASNM was providing impartial advice untainted by any conflicts of interest.

---

[3] A "Form ADV" is used by investment advisers to register with the SEC and state securities authorities. Form ADV, SEC, https://www.sec.gov/fast-answers/answersformadvhtm.html (last visited June 26, 2019).

4

While UASNM was boasting of its impartiality, Mr. Malouf was participating in deciding what UASNM would disclose. He acknowledged that he had reviewed some of the Forms ADV for what to disclose and had at least some familiarity with the contents of the website. But he took no steps to remedy UASNM's misstatements or to disclose his own conflict of interest.

### III. UASNM discloses Mr. Malouf's conflict of interest.

In June 2010, UASNM's outside consultant learned that Mr. Malouf had been receiving ongoing payments from Mr. Lamonde. With this information, the consultant told Mr. Malouf and UASNM that the payments had created a conflict of interest that needed to be disclosed. UASNM disclosed the conflict roughly nine months later.

### IV. The SEC finds that Mr. Malouf violated the federal securities laws.

The SEC then brought an enforcement proceeding against Mr. Malouf. Based on the evidence introduced in that proceeding, an administrative law judge found that Mr. Malouf had (1) aided and abetted UASNM's violations of the federal securities laws and (2) committed violations of his own. In the administrative appeal, the SEC agreed, finding that Mr. Malouf had violated

- § 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c),

5

- §§ 17(a)(1) and 17(a)(3) of the Securities Act of 1933, and

- §§ 206(1) and 206(2) of the Investment Advisers Act of 1940.

The SEC also found that Mr. Malouf had aided and abetted UASNM's violations of §§ 206(4) and 207 of the Investment Advisers Act and Rule 206(4)-1(a)(5).

The SEC imposed four sanctions on Mr. Malouf:

1. a lifetime bar from the securities industry,

2. an order to cease and desist violations of federal securities laws,

3. an order to disgorge $562,001.26 plus prejudgment interest, and

4. an order to pay a $75,000 civil penalty.

On appeal, Mr. Malouf makes four arguments:

1. The appointment of his administrative law judge violated the Constitution's Appointments Clause.

2. The SEC misinterpreted the securities laws.

3. The SEC's findings lack substantial evidence.

4. The sanctions should be vacated.

## Standard of Review

When considering these appellate arguments, we credit the SEC's factual findings if they are supported by substantial evidence. *Geman v. SEC*, 334 F.3d 1183, 1188 (10th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support

6

a conclusion." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1433 (10th Cir. 1988) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

**Discussion**

**I.    Mr. Malouf forfeited his challenge under the Appointments Clause.**

Mr. Malouf contends that the administrative law judge was not validly appointed under the Constitution's Appointments Clause. But Mr. Malouf forfeited this contention by failing to present it in the SEC proceedings.[4] Given the forfeiture, we decline to reach the merits of this challenge.

---

[4]    In its response brief, the SEC argues in part that Mr. Malouf forfeited the issue by omitting it in his opening appeal brief. We reject this argument.

Before the SEC filed its response brief, Mr. Malouf had requested leave to file a supplemental brief addressing the issue under the Appointments Clause. The SEC opposed the request, contending that Mr. Malouf should have raised the issue in his opening appeal brief. A motions panel provisionally granted Mr. Malouf's request, leaving the final decision to the merits panel and extending the SEC's deadline to file a response brief. So the SEC obtained notice and extra time to brief the issue before filing the response brief. Given the notice and extra time, consideration of the issue would not unfairly prejudice the SEC. In light of the absence of prejudice, we grant the request to supplement and reject the SEC's argument that Mr. Malouf forfeited the issue by failing to raise it in his opening appeal brief.

7

**A. Exhaustion of administrative remedies is mandatory under the pertinent statutes.**

The Constitution's Appointments Clause authorizes Congress to delegate the appointment of "inferior officers" to the President, courts, and department heads. U.S. Const. art. II § 2, cl. 2. Mr. Malouf contends that his administrative law judge was an "inferior officer" who had not been appointed by the President, a court, or a department head. *See Lucia v. SEC*, 138 S. Ct. 2044 (2018). For this contention, the threshold issue involves exhaustion of administrative remedies.

The underlying securities laws expressly require administrative exhaustion. *See* 15 U.S.C. §§ 77i(a) (Securities Act), 78y(c) (Securities Exchange Act), 80b-13(a) (Investment Advisers Act).[5] Given the statutory requirement, courts lack discretion to excuse the failure to exhaust administrative remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). Failure to comply with a mandatory exhaustion requirement prevents judicial review of the issue. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

---

[5] The exhaustion requirement encompasses constitutional claims. *See C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1439 (10th Cir. 1988) (concluding that the SEC could have addressed the petitioners' "constitutional concerns" and that the opportunity for administrative review had triggered the exhaustion requirement).

**B.** **Mr. Malouf lacks reasonable grounds to excuse his failure to exhaust.**

Mr. Malouf concedes that his administrative filings did not address the Appointments Clause. We thus must decide whether Mr. Malouf satisfies an exception to the exhaustion requirement.

The Securities Act does not contain an express exception to the exhaustion requirement, so we cannot excuse a failure to satisfy the Securities Act's exhaustion requirement. 15 U.S.C. § 77i(a); *see Ross*, 136 S. Ct. at 1856–57. But the other two securities statutes (the Securities Exchange Act and Investment Advisers Act) provide an exception, allowing the claimant to avoid the exhaustion requirement upon a showing of reasonable grounds. 15 U.S.C. §§ 78y(c)(1), 80b-13(a).

Mr. Malouf argues that he had two reasonable grounds to skip the exhaustion requirement:

1.   It would have been futile to raise this challenge in the SEC proceedings.

2.   The law changed after the SEC had ruled.[6]

_____

[6]   In two stray sentences, Mr. Malouf also states that enforcement of the exhaustion requirement would create a miscarriage of justice. But Mr. Malouf provides no explanation or support for these statements. Given the absence of explanation or support, we regard the two stray sentences as inadequate development of a distinct argument. *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008).

We reject both arguments.

### 1.    Raising the challenge would not have been futile.

Mr. Malouf argues that exhausting this challenge would have been futile because the SEC would undoubtedly have denied relief. We reject this argument.

The failure to pursue administrative remedies may be excused when exhaustion would have been futile. *Gilmore v. Weatherford*, 694 F.3d 1160, 1169 (10th Cir. 2012). But the futility exception is available only when the administrative process would have been "clearly useless." *Id.* (quoting *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1264 (10th Cir. 1998)).

Mr. Malouf has not shown that exhaustion of this challenge would have been clearly useless. Indeed, when he filed his brief in the SEC (on September 2, 2015), the SEC had not yet addressed the applicability of the Appointments Clause to administrative law judges.[7]

Despite the absence of any prior SEC decisions on the issue, Mr. Malouf insists that the SEC would have rejected this challenge. He points

---

[7]    The day after Mr. Malouf filed this brief, the SEC ruled for the first time that administrative law judges need not be appointed under the Appointments Clause. *In re Lucia*, SEC Release No. 4190, 2015 WL 5172953 (Sept. 3, 2015).

out that attorneys for the SEC had previously argued that its administrative law judges were not inferior officers subject to the Appointments Clause. But the prior arguments by SEC attorneys do not mean that exhaustion would have been futile. *See Gilmore v. Weatherford*, 694 F.3d 1160, 1169 (10th Cir. 2012) (rejecting an argument that the agency's position had been "predetermined" based on the agency's position in three earlier cases); *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1439 (10th Cir. 1988) ("[A]lthough petitioners contend that raising [the] argument below would have been futile given the SEC's past response, that alone is not a sufficient ground for presuming futility.").

Mr. Malouf points out that after he began his administrative appeal, the SEC frequently rejected challenges under the Appointments Clause. But these decisions do not mean that the SEC necessarily would have rejected a challenge by Mr. Malouf. *See Gilmore*, 694 F.3d at 1169 ("Requiring exhaustion of [claims asserted against agency precedent or an agency's litigation position] allows agencies to take into account the specific facts of each matter, and to change course if appropriate." (internal citation omitted)). Had Mr. Malouf exhausted available administrative remedies, the SEC might have changed its position on the Appointments Clause issue; and "if it did not, the [SEC] would at least be put on notice of the accumulating risk of wholesale reversals being incurred by its

11

persistence." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

Because Mr. Malouf has not shown that presentation of this challenge to the SEC would have been clearly useless, we do not regard exhaustion as futile.

## 2. No intervening change of law took place.

We also reject Mr. Malouf's reliance on an intervening change in the law.

For the sake of argument, we can assume that an intervening change in the law might constitute a reasonable ground to excuse the failure to exhaust. But the law did not change.

Mr. Malouf bases his argument largely on *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016), and *Lucia v. SEC*, 138 S. Ct. 2044 (2018).[8] In these cases, our court and the Supreme Court held that SEC administrative law judges are inferior officers subject to the Appointments Clause. *See Bandimere*, 844 F.3d at 1170; *Lucia*, 138 S. Ct. at 2049. The Courts decided these cases after the SEC had ruled in Mr. Malouf's case,

---

[8] Mr. Malouf also points to *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000). But *Landry* dealt with the Federal Deposit Insurance Corporation's administrative law judges, not the SEC's. *Landry*, 204 F.3d at 1130. Moreover, the D.C. Circuit's opinion does not control in our circuit.

12

preventing him from relying on either opinion during his administrative appeal. But neither *Bandimere* nor *Lucia* changed the law: In both cases, the Courts merely applied the Supreme Court's 1991 opinion in *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991).

In *Freytag*, the Supreme Court held that special trial judges for the Tax Court were inferior officers subject to the Appointments Clause. 501 U.S. at 881. The Supreme Court's decision hinged on the extensive powers granted to special trial judges, which were significant enough to characterize these judges as inferior officers. *See id.* at 881–82 (noting that special trial judges "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders"). SEC administrative law judges are "near-carbon copies" of the Tax Court's special trial judges. *Lucia*, 138 S. Ct. at 2052. So in *Bandimere* and *Lucia*, our court and the Supreme Court regarded *Freytag* as dispositive on the status of the SEC's administrative law judges. *Bandimere*, 844 F.3d at 1174 ("In our view, *Freytag* controls the result of this case."); *Lucia*, 138 S. Ct. at 2052 (concluding that *Freytag*'s analysis "necessarily decides this case").

In the SEC proceedings, Mr. Malouf could have invoked *Freytag*, just as the petitioners in *Bandimere* and *Lucia* had done. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018) (stating that no

13

precedent would have prevented a party from bringing an Appointments Clause challenge before *Lucia*, which itself "noted that existing case law 'sa[id] everything necessary to decide this case'" (quoting *Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018))).[9] Thus, Mr. Malouf cannot avoid the exhaustion requirement based on an intervening change in the law. *See Saffle v. Parks*, 494 U.S. 484, 488 (1993) (stating that a rule is not new if the court "would have felt compelled by existing precedent" to conclude that the rule being urged "was required by the Constitution").

* * *

Mr. Malouf failed to administratively exhaust his challenge under the Appointments Clause. We thus conclude that Mr. Malouf forfeited this challenge.[10]

---

[9]    In *Wilkerson*, the Sixth Circuit held that a party had forfeited its Appointments Clause challenge by waiting until the reply brief to present this challenge. 910 F.3d at 256.

[10]    The SEC concedes that Mr. Malouf's failure to exhaust this challenge does not constitute a jurisdictional defect. Despite this concession, we would ordinarily need to decide for ourselves whether the failure to exhaust is jurisdictional. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.").

Even if the exhaustion requirement were not jurisdictional, however, it would constitute a claim-processing rule. *See Henderson ex rel.*

**II.** **The SEC reasonably found that Mr. Malouf had violated Rule 10b-5[11] and § 17(a) of the Securities Act of 1933.**

The SEC found that Mr. Malouf had failed to correct material misstatements, violating

- Rule 10b-5(a) and (c) and

- the Securities Act of 1933 § 17(a)(1) and (3).

---

*Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (explaining that claim-processing rules are non-jurisdictional rules "that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"). Unlike jurisdictional requirements, claim-processing rules can be waived or forfeited. *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 783 (10th Cir. 2013).

But the SEC has not waived or forfeited the failure to exhaust. When Mr. Malouf first raised the Appointments Clause issue, the SEC promptly responded that Mr. Malouf had failed to exhaust the issue in SEC proceedings. We thus would need to enforce the statutory exhaustion requirements regardless of whether they are jurisdictional. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17–18 (2017) ("If properly invoked, mandatory claim-processing rules must be enforced, but they may be waived or forfeited."). Given the need to require exhaustion as either a claim processing rule or jurisdictional requirement, we need not decide which one applies. *See Manrique v. United States*, 137 S. Ct. 1266, 1271 (2017) (declining to decide whether the requirement to timely file a notice of appeal is jurisdictional because the requirement is "at least a mandatory claim-processing rule").

[11] The SEC also found that Mr. Malouf had violated the Securities Exchange Act of 1934 § 10(b). But this provision simply incorporates the SEC's "rules and regulations." 15 U.S.C. § 78j(b). The rule invoked here is Rule 10b-5.

15

For purposes of this appeal, Mr. Malouf does not deny that he failed to correct UASNM's misstatements. But he argues that a failure to correct UASNM's misstatements does not constitute a separate violation of the securities laws. We disagree.

**A.     Rule 10b-5(a) and (c) and § 17(a)(1) and (3) of the Securities Act of 1933 encompass the failure to correct UASNM's false or misleading statements.**

The relevant provisions ban two broad categories of conduct. The first category involves the making of a materially untrue or misleading statement. The second category involves employment of a fraudulent or deceptive scheme. Addressing the second category, the SEC found that Mr. Malouf had failed to correct UASNM's false or misleading statements, triggering liability for employment of a fraudulent or deceptive scheme.

Mr. Malouf contends that liability cannot be based on his failure to correct UASNM's misstatements because the failure to correct is inseparable from the misstatements themselves. In his view, the SEC "obliterate[d] the distinction" between the two categories of prohibited conduct. Appellant's Opening Br. at 23. We reject this argument based on *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).

In *Lorenzo*, the Supreme Court confronted the same two categories of prohibited conduct. The first category is enshrined in Rule 10b-5(b), which

prohibits the making of a statement that is materially false or misleading.

17 C.F.R. § 240.10b-5(b). The second category is enshrined in

- Rule 10b-5(a) and the Securities Act of 1933 § 17(a)(1), which prohibit the employment of a fraudulent "device, scheme, or artifice" and

- Rule 10b-5(c), which prohibits engagement in an "act, practice, or course of business" operating as a "fraud or deceit."

15 U.S.C. § 77q(a)(1); 17 C.F.R. § 240.10b-5(a), (c).

In *Lorenzo*, the SEC found that the petitioner had disseminated another's false statement with scienter.[12] *Lorenzo*, 139 S. Ct. at 1099. The Supreme Court granted certiorari in *Lorenzo* to decide "whether someone who is not a 'maker' of a misstatement under [Rule 10b-5(b)] . . . can nevertheless be found to have violated [Rule 10b-5(a) and (c)] and related provisions of the securities laws, when the only conduct involved concerns a misstatement." *Id.* at 1100.

The Supreme Court answered "yes." *See id.* at 1100–01. In urging the opposite result, the petitioner argued that the prohibitions applicable to "makers" of false statements would be superfluous if someone could incur liability by disseminating another person's false statement. *Id.* at 1101. The Supreme Court rejected this argument based on the prohibitions'

---

[12] The *Lorenzo* Court assumed that the petitioner himself had not made a false or misleading statement. *Lorenzo*, 139 S. Ct. at 1100.

language, purpose, and overlap. *Id.* at 1102–03. Applying *Lorenzo*, we conclude that Mr. Malouf's failure to correct UASNM's misstatements could trigger liability.

The Court in *Lorenzo* applied three of the provisions that the SEC has invoked against Mr. Malouf:

1. Rule 10b-5(a),

2. Rule 10b-5(c), and

3. the Securities Act of 1933 § 17(a)(1).

The Court expressly held that a person could incur liability under these provisions when the conduct involves another person's false or misleading statement. *Id.* at 1102. In reaching this holding, the Supreme Court rejected the same argument urged by Mr. Malouf (that the SEC's interpretation would render Rule 10b-5(b) superfluous). *Id.* at 1101–03.

The *Lorenzo* Court did not address a fourth provision involved here: the Securities Act of 1933 § 17(a)(3). But this provision is virtually identical to Rule 10b-5(c), which *Lorenzo* did address. Rule 10b-5(c) prohibits anyone using interstate commerce from "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(c). Similarly, the Securities Act of 1933 § 17(a)(3) states that offerors or sellers of securities cannot "engage in any

18

transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3).

In light of this similarity, Mr. Malouf urges us to interpret § 17(a)(3) coextensively with Rule 10b-5(c). We do so; *Lorenzo* thus controls on § 17(a)(3) as well as the other provisions.

**B.    Substantial evidence exists for the findings that Mr. Malouf violated Rule 10b-5(a) and (c) and the Securities Act of 1933 § 17(a)(1) and (3).**

The resulting question is whether substantial evidence supports the SEC's findings that Mr. Malouf violated Rule 10b-5(a) and (c) and § 17(a)(1) and (3) of the Securities Act of 1933. Mr. Malouf argues that the findings lack substantial evidence because

- he did not engage in prohibited conduct and

- the evidence does not establish scienter.

**1.    The applicable provisions address prohibited conduct and scienter.**

The pertinent securities laws prohibit fraudulent conduct. For example, Rule 10b-5(a) and the Securities Act of 1933 § 17(a)(1) prohibit the employment of a device, scheme, or artifice to defraud. 17 C.F.R. § 240.10b-5(a); 15 U.S.C. § 77q(a)(1). "A 'device' . . . is simply that which is devised, or formed by design; a 'scheme' is a project, plan, or program of something to be done; and an 'artifice' is an artful stratagem or trick." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019) (quoting *Aaron v.*

19

*SEC*, 446 U.S. 680, 696 n.13 (1980)). Rule 10b-5(c) bars a fraudulent or deceitful act, practice, or course of business. 17 C.F.R. § 240.10b-5(c). The Securities Act of 1933 § 17(a)(3) similarly prohibits fraudulent or deceitful transactions, practices, or courses of business. 17 U.S.C. § 77q(a)(3).

In addressing these provisions, Mr. Malouf challenges the sufficiency of the evidence on scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). This mental state can include extreme recklessness. *Id.* Conduct is extremely reckless when the petitioner knows or must have known that the conduct created a danger of misleading investors. *Id.*

Scienter is required to find a violation of Rule 10b-5(a), Rule 10b-5(c), or the Securities Act of 1933 § 17(a)(1). But scienter is not required for a violation of the Securities Act of 1933 § 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980).

**2.     The SEC acted reasonably in finding improper conduct.**

Given these definitions, we conclude that the SEC did not err in finding a fraudulent device, scheme, or artifice to defraud.

20

The evidence allowed the SEC to reasonably find a conflict of interest: while working at UASNM, Mr. Malouf maintained a financial arrangement with Mr. Lamonde, the purchaser of the Raymond James branch. Mr. Malouf knew not only that a conflict existed but also that UASNM was telling its clients that he was independent. Despite this knowledge, Mr. Malouf took no steps to correct UASNM's statements or to disclose his own conflict. Given this failure to correct misstatements or to disclose his conflict, the SEC reasonably found the existence of

- an artful stratagem or plan devised to defraud investors under Rule 10b-5(a) and the Securities Act of 1933 § 17(a)(1) and

- a fraudulent or deceptive act, practice, or course of business under Rule 10b-5(c) and the Securities Act of 1933 § 17(a)(3).

**3.    The SEC acted reasonably in finding scienter.**

Mr. Malouf also challenges the finding of scienter on the claims involving Rules 10b-5(a) and (c) and the Securities Act of 1933 § 17(a)(1).[13] We reject this challenge.

Mr. Malouf and Mr. Lamonde had a financial arrangement that resulted in payments to Mr. Malouf from bond trades that he had routed through the Raymond James branch. This arrangement gave an incentive to

---

[13]     As noted above, § 17(a)(3) of the Securities Act of 1933 does not require scienter. *See* p. 20, above.

Mr. Malouf to route his clients' bond trades through the Raymond James branch, compromising the independence of UASNM and Mr. Malouf as investment advisers. The SEC reasonably concluded that Mr. Malouf was aware of the conflict and tried to exploit it, for UASNM's outside consultant testified that Mr. Malouf had lied and resisted disclosure of the financial arrangement with Mr. Lamonde.

Mr. Malouf denies scienter, insisting that he did not know of misstatements on the Forms ADV or the UASNM website. For these misstatements, Mr. Malouf pins the blame on UASNM's chief compliance officer. For three reasons, we reject Mr. Malouf's arguments and conclude that substantial evidence supports the SEC's finding of scienter.

First, the SEC reasonably rejected Mr. Malouf's effort to shift the blame. The chief compliance officer admittedly knew that the Raymond James branch had been sold, but he denied knowing about the arrangement for installment payments.

Second, the evidence allowed the SEC to reasonably find that Mr. Malouf was familiar with the contents of UASNM's Forms ADV and its website. For example, Mr. Malouf admitted that he had periodically reviewed the Forms ADV and the website. Yet for several years, Mr. Malouf took no action to correct material misstatements on the forms or the website.

22

Third, the evidence suggests that Mr. Malouf dragged his feet even after being directed to disclose the conflict. This directive stemmed from the outside consultant's discovery that Mr. Malouf had been receiving installment payments from the buyer of the Raymond James branch. Upon this discovery, the consultant told Mr. Malouf and UASNM that the arrangement had created a conflict of interest that needed to be disclosed. But about nine months passed before UASNM disclosed the conflict. Mr. Malouf's contribution to that delay reasonably supports a finding of scienter.

* * *

The SEC reasonably found that Mr. Malouf had acted with scienter to (1) employ a device, scheme, or artifice to defraud and (2) engage in an act, practice, or course of business that operated as a fraud or deceit. We thus affirm the SEC's conclusion that Mr. Malouf violated Rule 10b-5(a) and (c) and the Securities Act of 1933 § 17(a)(1) and (3).

III. **The SEC reasonably found violations of the Investment Advisers Act of 1940 §§ 206 and 207 and Rule 206(4)-1(a)(5).**

The SEC also found that Mr. Malouf had

- violated § 206(1) and (2) of the Investment Advisers Act and

- aided and abetted UASNM's violations of §§ 206(4) and 207 of the Investment Advisers Act and Rule 206(4)-1(a)(5).

We uphold these findings.

23

**A.     The SEC reasonably found primary violations of § 206 of the Investment Advisers Act.**

Under § 206 of the Investment Advisers Act, investment advisers cannot

- employ a device, scheme, or artifice to defraud a client or

- engage in a transaction, practice, or course of business that operates as a fraud or deceit upon a client.

15 U.S.C. § 80b-6(1)–(2). The SEC concluded that Mr. Malouf had violated § 206(1) and (2) of the Act in three ways:

1.     by failing to correct the misstatements on UASNM's Forms ADV and website,

2.     by failing to disclose his conflict of interest to his clients, and

3.     by failing to seek best execution for his clients' bond trades.

Mr. Malouf argues that the SEC erred in concluding that he violated § 206(1) and (2) because

- the failure to correct UASNM's misstatements cannot support liability,

- the finding of scienter (when failing to disclose the conflict of interest) is not supported by substantial evidence, and

- he owed no duty of best execution and the finding of a violation is unsupported by the evidence.

We reject Mr. Malouf's arguments.

**1. A violation could be based on Mr. Malouf's failure to correct UASNM's misstatements.**

Mr. Malouf argues that he cannot incur liability under § 206(1) and (2) simply because he failed to correct UASNM's misstatements. In Part II, we addressed the same issue under

- the Securities Act of 1933 § 17(a)(1) and (3) and

- Rule 10b-5(a) and (c).

*See* Discussion-Part II(A), above. The language in these provisions is virtually identical to the language in the Investment Advisers Act § 206(1) and (2).[14] Given the virtually identical wording, Mr. Malouf urges us to

---

[14]     The Investment Advisers Act § 206(1) states that an investment adviser cannot "employ any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Similarly, the Securities Act of 1933 § 17(a)(1) states that an offeror or seller of securities cannot "employ any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1). And Rule 10b-5(a) states that no one can use interstate commerce "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a).

The Investment Advisers Act § 206(2) prohibits investment advisers from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). The Securities Act of 1933 § 17(a)(3) similarly states that offerors or sellers of securities cannot "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). And Rule 10b-5(c) prohibits the use of interstate commerce "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(c).

25

interpret the Investment Advisers Act in the same way that we interpret

Rule 10b-5(a) and (c) and the Securities Act of 1933 § 17(a)(1) and (3).

We do so in light of the virtually identical language in these provisions.

*See SEC v. Steadman*, 967 F.2d 636, 641 n.3 (D.C. Cir. 1992) (interpreting

the Investment Advisers Act § 206(1) in the same way that the Supreme

Court interpreted the Securities Act of 1933 § 17(a)(1) because the

statutory language is virtually identical). Given this interpretation, we

conclude that Mr. Malouf's failure to correct UASNM's misstatements

could create liability under the Investment Advisers Act § 206(1) and (2).

> **2. Substantial evidence exists for the finding of scienter based on Mr. Malouf's failure to disclose his conflict of interest.**

Liability under the Investment Advisers Act § 206(1) requires proof

of scienter; liability under § 206(2) requires only simple negligence.

*Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019). Scienter can

encompass extreme recklessness. *See* p. 20, above.

The SEC found scienter in Mr. Malouf's failure to disclose his

conflict. Mr. Malouf challenges this finding on grounds that he

- was "set-up" by UASNM's chief compliance officer and

- believed that the chief compliance officer had been disclosing the conflict.

But the SEC reasonably credited the chief compliance officer's testimony

that he had not known about Mr. Malouf's conflict. *See* p. 22, above. We

26

thus reject Mr. Malouf's challenge to the SEC's finding of scienter on the claim under § 206(1) of the Investment Advisers Act.

### 3. Mr. Malouf owed a duty of best execution, and the SEC's finding of a violation is supported by substantial evidence.

The duty of best execution requires a broker-dealer to seek the best terms reasonably available for customer orders. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998) (en banc). Mr. Malouf argues that

- the SEC erred by finding that he owed this duty and

- the evidence was insufficient to find a violation of this duty.[15]

We reject both arguments, concluding that (1) Mr. Malouf owed a duty of best execution to his clients and (2) substantial evidence supports the finding of a violation.

Under the duty of best execution, a fiduciary bears an obligation to seek "the most favorable terms reasonably available under the circumstances." *Geman v. SEC*, 334 F.3d 1183, 1186 (10th Cir. 2003)

---

[15] Mr. Malouf also suggests that the SEC erroneously ignored the administrative law judge's conclusions of law. This suggestion assumes that the administrative law judge's conclusions of law bound the SEC when it reviewed the judge's decision. Mr. Malouf supplies no authority for this assumption.

(quoting *Newton*, 135 F.3d at 270). This obligation requires investment advisers to seek the lowest price reasonably available for a client unless the more expensive option results in better service. *See Newton*, 135 F.3d at 270 n.2; *Securities; Brokerage and Research Services*, SEC Release No. 23170, 1986 WL 630442, at *11 (Apr. 23, 1986).[16] When an investment adviser is affiliated with the brokerage firm executing the transaction, the adviser must make a good-faith judgment that the commission charged "is at least as favorable to the [client] as that charged by other qualified brokers." *Applicability of Comm.'s Policy Statement on the Future Structure of Securities Markets to Selection of Brokers and Payment of Commissions by Institutional Managers*, SEC Release No. 318, 1972 WL 121270, at *2 (May 17, 1972). In cases of self-dealing, the investment

---

[16] We defer to the SEC's reasonable interpretations of ambiguous statutory provisions in federal securities laws when the interpretations carry the "force of law." *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1162 (10th Cir. 2011); *see SEC v. Zandford*, 535 U.S. 813, 819–20 (2002) (stating that the SEC's reasonable interpretation of an ambiguous provision of the Securities Exchange Act, issued in a formal adjudication, is entitled to deference). We otherwise consider the SEC's interpretations only for their persuasive value. *Thomas*, 631 F.3d. at 1162–63.

In citing the SEC releases, we use them only for their persuasive value. We need not decide whether the SEC releases are subject to deference.

28

adviser bears a "particularly heavy" burden to justify a commission rate exceeding the lowest available rate. *Id.*

Mr. Malouf concedes that the duty of best execution requires reasonable diligence to ensure the best price reasonably available. But Mr. Malouf argues that the duty of best execution is owed by the investment firm as a whole, not by him individually. For this argument, Mr. Malouf relies on Regulatory Notice 15-46 of the Financial Industry Regulatory Authority. This notice refers to a "firm's best execution obligation." *Guidance on Best Execution Obligations in Equity, Options and Fixed Income Markets*, FINRA Regulatory Notice 15-46, at 4 (Nov. 2015). Mr. Malouf seizes on this language in denying that the obligation applies to individual brokers like himself. We reject Mr. Malouf's argument for two reasons:

1. The duty of best execution comes from the Investment Advisers Act, not Regulatory Notice 15-46.

2. Mr. Malouf has misinterpreted Regulatory Notice 15-46.

First, the duty of best execution originated in the Investment Advisers Act rather than Notice 15-46. *See Kurz v. Fidelity Mgmt. & Research Co.*, 556 F.3d 639, 640 (7th Cir. 2009) (stating that the duty of best execution is "widely understood as a subject of regulation" under the federal securities laws, including the Investment Advisers Act). The Act prohibits investment advisers from engaging in a fraudulent or deceptive

29

transaction, practice, or course of business. Investment Advisers Act, 15 U.S.C. § 80b–6(2). This prohibition imposes a fiduciary duty of loyalty on investment advisors, and the duty of loyalty subsumes the duty of best execution. *See SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 191–92 (1963) (recognizing that the Investment Advisers Act obligates investment advisers to provide "disinterested" advice); *In re Hughes*, Exchange Act Release No. 4048, 1948 WL 29537, at *5 (Feb. 18, 1948) ("A corollary of the fiduciary's duty of loyalty to his principal is his duty to obtain . . . the best price discoverable in the exercise of reasonable diligence."), *aff'd sub nom. Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949). Thus, the Act ultimately imposes a duty of best execution on investment advisers (not just their firms). *See In re DeSano*, Advisers Act Release No. 2815, 2008 WL 5189512, at *4 (Dec. 11, 2008) ("Under Section 206 of the [Investment] Advisers Act, an investment adviser has a fiduciary duty to seek best execution for its clients' security transactions.").

Second, Mr. Malouf has misinterpreted Notice 15-46. This notice points out that the Financial Industry Regulatory Authority has codified the duty of best execution in Rule 5310 of the Financial Industry Regulatory Authority Manual. Rule 5310 provides:

> In any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so

that the resultant price to the customer is as favorable as possible under prevailing market conditions.

Financial Industry Regulatory Authority Manual, Rule 5310(a)(1).

Rule 5310 does not confine the duty of best execution to firms: it applies to "a member and persons associated with a member." The rule's definition of the term "member" includes "any individual, partnership, corporation or other legal entity admitted to membership" in the Financial Industry Regulatory Authority, and the term "person" includes "any natural person." *Id.*, Rule 160(b)(10) & (12). Thus, Mr. Malouf's argument is based on a misreading of Rule 5310.

But Mr. Malouf also argues that even if he owed the duty of best execution, he would avoid liability because he delegated compliance to the chief compliance officer. For this argument, Mr. Malouf identifies the administrative law judge's conclusions of law that the chief compliance officer's duties included

- review of UASNM's trade tickets to ensure that the commissions were reasonable and that the investment advisers were complying with UASNM's best-execution policy and

- review to ensure compliance with UASNM's compliance manual.

31

But Mr. Malouf does not identify any evidence that he delegated his own compliance with the best-execution policy.[17]

He instead points to conclusions of law stating that the chief compliance officer's duties included policing of UASNM employees for adherence to the firm's manual. But these conclusions of law do not undermine the obligation of investment advisers (like Mr. Malouf) to comply with their own fiduciary duties to their clients. *See Commission Guidance Regarding Client Commission Practices Under Section 28(E) of the Securities Exchange Act of 1934*, Exchange Act Release, No. 54165, 2005 WL 4843294, at *2 & n.3 (July 18, 2006) (stating that investment advisers bear duties to act in their clients' best interests).

Mr. Malouf also argues that

- there is no evidence that he could have executed trades for better prices and

- he was not obligated to seek competing bids from brokers before executing bond trades.

We reject both arguments.

---

[17] Even if Mr. Malouf had delegated his own compliance with the duty of best execution, he would remain liable. *See Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006) (stating that when a fiduciary delegates tasks to others, the fiduciary remains "responsible for actions performed in his name").

First, Mr. Malouf denies that he could have executed bond trades for better prices than those offered by the Raymond James branch. But the SEC could reasonably arrive at a contrary finding based on (1) the testimony of an expert witness and (2) Mr. Malouf's own testimony.

An expert witness opined that Mr. Malouf's trades had resulted in commissions to the Raymond James branch substantially exceeding the industry's standard commissions. In reaching this opinion, the expert witness assumed that standard commissions range from 0.10 to 0.75 percent of the total amount of the bond transaction. He based this range on personal experience, industry research, and consultation with other experts in the field. With this assumption, the expert witness studied the bond trades that Mr. Malouf had routed through the Raymond James branch and determined that his clients had paid commissions between $442,106 and $693,804 above the standard rate.

The expert witness presented two diagrams showing the differences between the actual commissions paid on Mr. Malouf's trades and standard commissions[18]:

---

[18]    We have slightly edited the diagrams for clarity.





The SEC credited

- the expert witness's lower figure of total excess commissions paid by Mr. Malouf's clients to the Raymond James branch ($442,106) and

- Mr. Malouf's own testimony about the percentage of UASNM bond trades that he had conducted (60%).

34

Based on its findings, the SEC concluded that Mr. Malouf was responsible for $265,263.60 in excess commissions paid by UASNM clients. In light of the expert witness's testimony, we conclude that the SEC reasonably found that Mr. Malouf could have executed trades for better prices.

Second, Mr. Malouf contends that the duty of best execution did not obligate him to seek multiple bids. Even without this obligation, the SEC concluded that Mr. Malouf's failure to seek multiple bids supported a finding of scienter. This conclusion was based on substantial evidence.

The expert witness testified that multiple bids provide the ideal way to satisfy the duty of best execution. Mr. Malouf agreed with this testimony and conceded that he had routinely failed to seek competing bids before routing trades through the Raymond James branch, with which he had an undisclosed financial relationship. The SEC thus reasonably found that Mr. Malouf had routed trades to the Raymond James branch in order to benefit himself to the detriment of his clients.

\* \* \*

We conclude that the SEC reasonably found that Mr. Malouf had violated the Investment Advisers Act § 206(1) and (2) by failing to

- correct UASNM's misstatements,
- disclose a conflict of interest, and
- seek best execution.

35

**B.  The SEC also reasonably found that Mr. Malouf had aided and abetted UASNM's violations of §§ 206 and 207 of the Investment Advisers Act and Rule 206(4)-1(a)(5).**

Section 206 of the Investment Advisers Act bans practices that are fraudulent, deceptive, or manipulative. 15 U.S.C. § 80b-6(4). For example, it is fraudulent, deceptive, or manipulative to publish an advertisement containing an untrue statement of material fact. 17 C.F.R. § 275.206(4)-1(a)(5). And under § 207 of the Act, an investment adviser cannot omit material facts in an SEC report (like a Form ADV). 15 U.S.C. § 80b-7.

Applying these prohibitions, the SEC found that Mr. Malouf had aided and abetted UASNM's violations of the Investment Advisers Act and Rule 206(4)–1(a)(5). According to the SEC, UASNM violated these provisions by

- stating in the Forms ADV and on the company's website that the employees had no conflicts of interest and

- failing to disclose Mr. Malouf's conflict of interest.

The SEC also found that Mr. Malouf had aided and abetted these violations by recklessly failing to tell UASNM that he had a conflict of interest.

Mr. Malouf does not contest UASNM's commission of a primary violation. He instead argues that the SEC lacks substantial evidence for its finding that he had aided and abetted UASNM's violations. According to Mr. Malouf, evidence was lacking on

- scienter and

36

- substantial assistance of UASNM's violations.

Mr. Malouf also argues that by declining to charge him with aiding and abetting a violation of Rule 10b-5(b), the SEC undermined its finding that he had aided and abetted a violation of the Investment Advisers Act. We reject Mr. Malouf's arguments.

First, Mr. Malouf contests the SEC's finding of scienter. As Mr. Malouf suggests, scienter is an essential element of aiding and abetting a violation of the securities law. *See Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004) (stating that liability for aiding and abetting requires scienter). But we have already concluded that the SEC had reasonably found scienter based on Mr. Malouf's failure to correct UASNM's misstatements about the absence of a conflict of interest. *See* pp. 21–23, above.[19]

---

[19]    Mr. Malouf argues that scienter cannot be based on his failure to detect another's misconduct. To support this argument, he cites *Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004). There the D.C. Circuit held that the defendant had not acted with scienter when the only evidence of his intent was that he should have known about another's wrongdoing. 376 F.3d at 1143.

*Howard* is not analogous. The SEC reasonably found that Mr. Malouf had recognized a conflict of interest, known that he needed to disclose it, and known that he had not disclosed to UASNM that his conflict was ongoing. Given this knowledge, Mr. Malouf knew or must have known that

Second, Mr. Malouf contests the finding on substantial assistance, stating that his failure to correct UASNM's misstatements did not facilitate its fraudulent scheme. But in finding substantial assistance, the SEC did not rely on a failure to correct UASNM's misstatements; the SEC instead relied on Mr. Malouf's failure to disclose his conflict of interest arising from Mr. Lamonde's ongoing payments. UASNM's failure to disclose this conflict of interest stemmed largely from Mr. Malouf's failure to tell other UASNM officers about the ongoing payments from Mr. Lamonde. Without this information, the other UASNM officers had no way of knowing that Mr. Malouf was personally benefiting from bond trades routed through the Raymond James branch.

Finally, Mr. Malouf points to the SEC's decision not to charge him with aiding and abetting UASNM's making of a material misstatement in violation of Rule 10b-5(b). According to Mr. Malouf, the absence of such a charge must mean that the SEC did not believe that he had aided and abetted UASNM's violations. But Mr. Malouf does not provide any

UASNM could not fully disclose the conflict. At a minimum, the SEC had substantial evidence for its finding that Mr. Malouf had acted with extreme recklessness by facilitating UASNM's failure to disclose the conflict. *See Geman v. SEC*, 334 F.3d 1183, 1195 (10th Cir. 2003) (holding that an individual had acted with extreme recklessness when he was aware of undisclosed information and "surely knew" that it had not been adequately reported).

authority for this leap. "[A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. So the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another . . . ." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The SEC's decision not to bring an aiding or abetting charge under Rule 10b-5(b) does not affect the existence of substantial evidence, so we decline to disturb the SEC's findings on this basis.

**IV.   The SEC did not err in deciding on the sanctions to impose.**

Based on Mr. Malouf's violation of the securities laws and related rules, the administrative law judge imposed three sanctions:

1.   a 7-1/2 year bar from the securities industry,

2.   an order to cease and desist violations of the federal securities laws, and

3.   a civil penalty of $75,000.

The SEC extended the bar from 7-1/2 years to life, ordered Mr. Malouf to disgorge $562,001.26 plus prejudgment interest, and adopted the

administrative law judge's other sanctions. Mr. Malouf asks us to vacate the SEC's lifetime ban and disgorgement order.[20]

We do not disturb sanctions imposed by the SEC unless they are "beyond the law, devoid of factual support, or are 'so lacking in reasonableness as to constitute an abuse of discretion.'" *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1438 (10th Cir. 1988) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 115 (1946)). In our view, the SEC did not abuse its discretion in imposing the lifetime bar or in ordering Mr. Malouf to disgorge $562,001.26 plus prejudgment interest.

## A. The SEC did not abuse its discretion in ordering a lifetime bar from the securities industry.

Under the Investment Advisers Act, the SEC may bar advisers from associating with the securities industry if

- they "willfully violated" or "willfully aided [and] abetted . . . the violation" of federal securities law and

- the bar is in the public interest.

_____

[20] In his reply brief, Mr. Malouf also contends that his sanctions were disproportionate to the sanctions imposed in other cases. But Mr. Malouf did not present this contention in his opening appeal brief. Raising the issue in his reply brief was too late. *See, e.g.*, *WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014) (stating that it "was too late" to present a new issue in the petitioners' reply brief).

15 U.S.C. § 80b-3(e)(5)–(6) & (f). The SEC concluded that both conditions had been met.

Mr. Malouf argues that

- he did not act willfully,

- the SEC penalized him for defending himself, and

- the public interest did not support a lifetime bar in light of his disclosures preceding the SEC investigation and his payment of restitution and civil penalties.

We reject these arguments.

First, according to Mr. Malouf, the SEC's finding of willfulness must have been based on his failure to require disclosure from others. For this argument, Mr. Malouf insists that he delegated the duty of disclosure. We disagree. Mr. Malouf blames the chief compliance officer, but this officer could not have been expected to disclose a conflict of interest that he had not known about. *See* pp. 22, 26, above. The SEC thus did not abuse its discretion in determining that Mr. Malouf had acted willfully.

Second, Mr. Malouf contends that the SEC penalized him for defending himself. We disagree. The SEC reasonably considered Mr. Malouf's failure to recognize his own wrongdoing. *See Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) (noting that a defendant's admission of wrongful conduct (or lack of an admission thereof) is a factor "that [has] been deemed relevant to the issuance of an injunction" from the

securities industry), *aff'd*, 450 U.S. 91 (1981); *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1255 (11th Cir. 2017) (upholding a bar on continued work in an industry when the SEC found that the petitioner had not genuinely acknowledged his wrongdoing). Consideration of one's acceptance of responsibility constitutes "a routine and unexceptionable feature . . . of criminal, let alone civil, punishment." *SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002). And the agency record is replete with examples of Mr. Malouf's refusal to accept responsibility for his actions. The SEC thus did not abuse its discretion in considering Mr. Malouf's failure to accept responsibility.

Finally, Mr. Malouf stresses his (1) disclosures preceding the SEC's investigation and (2) prior payment of huge sums in restitution and civil penalties. But his earlier disclosures and payments do not render a lifetime bar unreasonable. Mr. Malouf waited roughly three years before making the disclosures. And for about nine months of that period, Mr. Malouf ignored an outside consultant's directions to make the disclosures. The SEC considered Mr. Malouf's delay together with his payments toward restitution and civil penalties, concluding that a lifetime bar from the securities industry was justified. The SEC's reasoning is rational and supported by the evidence.

## B. The SEC did not abuse its discretion in ordering disgorgement of $562,001.26 plus prejudgment interest.

Mr. Malouf also asks us to vacate the SEC's order that he disgorge $562,001.26 plus prejudgment interest, arguing that he did not commit fraud or violate the law. For this argument, he again casts blame on the chief compliance officer for failing to disclose the financial arrangement that created a conflict of interest. But we have elsewhere rejected Mr. Malouf's effort to pin the blame on the chief compliance officer. *See* pp. 22, 26, 41, above.

Mr. Malouf also suggests that the SEC abused its discretion by ordering him to disgorge the funds that he had received from Mr. Lamonde. The administrative law judge had regarded those funds as legal profits that Mr. Malouf did not need to disgorge. The SEC disagreed, concluding that the payments had resulted from Mr. Malouf's violations of the securities laws. Mr. Malouf suggests that the SEC should have followed the administrative law judge's characterization of the payments.

The SEC did not abuse its discretion. Mr. Malouf knew that he was profiting when he and others at UASNM routed bond transactions through the Raymond James branch. *See* Appellant's App'x, vol. 4, at 941–42 (testimony of Mr. Malouf) (admitting that he traded through the Raymond James branch in part to get paid). Yet Mr. Malouf waited years to tell others at UASNM about his ongoing payments from Mr. Lamonde. Given

43

this delay in disclosing the conflict, the SEC reasonably concluded that all of the payments to Mr. Malouf were traceable to his misconduct and needed to be disgorged. *See SEC. v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) (recognizing that the amount to be disgorged need only be a "'reasonable approximation' of illegal profits"). We thus reject Mr. Malouf's challenge to the disgorgement order.

Affirmed.